UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
                         EASTERN DIVISION

| | |
|---|---|
| PAUL PHILLIPS and LEWIS GARDNER, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 14 C 9372 |
| ) | |
| CITY OF CHICAGO; CHICAGO POLICE ) | Judge Rebecca R. Pallmeyer |
| OFFICERS ANTHONY VILLARDITA #20849, ) | |
| THOMAS JOHNSON #20820, BRIAN ) | |
| KILLACKY #20748, TERRY O'CONNOR ) | |
| #20831, RICK ABREU #20796, ROBERT ) | |
| DELANEY #20383, ROBERT HERYMAN ) | |
| #14984, SEAN GLINSKI #3122, MICHAEL ) | |
| BERTI #12881, and UNIDENTIFIED ) | |
| EMPLOYEES OF THE CITY OF CHICAGO, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Paul Phillips and Lewis Gardner were convicted of murder in 1995 and petitioned successfully in 2014 to have their convictions vacated. They now bring this action under 42 U.S.C. § 1983 and Illinois law against the City of Chicago, Illinois; nine Chicago police officers; and unidentified City employees, alleging various violations of their constitutional rights, malicious prosecution, intentional infliction of emotional distress, and civil conspiracy. Defendants move to dismiss the suit pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, Defendants' motions to dismiss are granted in part and denied in part.

## FACTUAL BACKGROUND

The amended complaint [3] alleges the following facts. On November 16, 1992 at approximately 8:43 p.m., Jeffrey Lassiter and Sharon Haugabrook were shot and killed in Mr. Lassiter's apartment in Chicago. (Compl. ¶¶ 12, 15.) Police officers arrived at the scene promptly and learned that a witness, Faye McCoy, had seen four men leaving Mr. Lassiter's building shortly after the murders. (*Id.* ¶ 15.) Ms. McCoy told Defendant Officers that these

were men from the city's West Side who had recently been selling drugs in the community; she recognized one of the men as a person she knew as "Goldie." (*Id.* ¶ 17.) When Defendant Officers provided her with a photo array of seven potential suspects, she identified the photograph of Dennis "Goldie" Mixon as one of the four men she had seen leaving the murder scene. Other witnesses identified Mr. Mixon as a drug dealer who had recently had a physical altercation with Mr. Lassiter, and as a result of these statements, Mr. Mixon became Defendant Officers' prime suspect in the case. (*Id.* ¶¶ 18–20.) The police were unable to locate him, however, so the case "went cold" for several days. (*Id.*)

On December 2, 1992, Plaintiff Lewis Gardner was arrested on unrelated charges. (*Id.* ¶ 20.) Defendant Officers Villardita, Johnson, Killacky, O'Connor, Abreu, Delaney, and Heryman interrogated Mr. Gardner, then a 15-year-old with an IQ of 70, for over 15 hours, barring his mother from the interrogation room, psychologically abusing him, and promising that he could go home if he gave a statement matching what they had told him about the case. (*Id.* ¶ 22.) Mr. Gardner "succumbed to the coercion" and agreed to a statement "fabricated by these Defendant Officers" and falsely implicating himself and six others in the murders. (*Id.*) Defendant Officers proceeded to arrest and similarly coerce confessions from these others, including Plaintiff Paul Phillips (then age 17), as well as Daniel Taylor, Akia Phillips, Joseph Brown, Deon Patrick, and Rodney Mathews. (*Id.* ¶ 23.) Defendants' methods included acts of physical abuse; intimidation and threats with a gun; isolation from family; deprivation of sleep, food, and access to the restroom; and false promises that the arrestees could go home if they confessed. (*Id.* ¶ 24.) Defendants fed the young men information about the murders to ensure that their "confessions" were consistent with facts the officers already knew. (*Id.*) Mr. Phillips was detained for 24 hours without access to his parents and was subjected to many of these coercive techniques. (*Id.* ¶ 25.) Defendant Officers did not disclose any of their conduct to responsible authorities. (*Id.* ¶ 26.)

Gardner and Phillips' confession statements detailed their own participation in planning the murders along with the other "equally innocent" victims of the round-up: those statements included purported eyewitness accounts of Daniel Taylor's entering Mr. Lassiter's apartment just before the murders with four other persons, the sound of gunshots, and observation of Taylor and others exiting the murder scene soon afterwards. (*Id.* ¶¶ 28–29.) The other five suspects, including Taylor himself, gave almost identical statements to the police, about which several of Defendant Officers later testified at Plaintiffs' trial. (*Id.* ¶ 30; Reply Br., Doc. 45, at 30–31.)

In fact, Daniel Taylor was in police custody from 6:45 p.m. until 10:00 p.m. on the night of the shootings, as he later informed the police and as confirmed by his arrest report and bond slip. (*Id.* ¶¶ 31, 33–36.) Undeterred by this revelation, Defendant Officers prepared a false police report documenting an encounter between police and Mr. Taylor on the street near Mr. Lassiter's apartment around 9:30 p.m. on the night of the murders; they did not disclose the falsity of this report to prosecutors, the court, Plaintiffs, or their attorneys. (*Id.* ¶¶ 39–40.) They also interviewed Mr. Taylor's cellmate from that night, James Anderson, who confirmed that Mr. Taylor had been in police custody with him at the time of the murders; again, Defendant Officers did not share this exculpatory information. (*Id.* ¶¶ 46–48.)

Through threats and offers of leniency on his then-pending charges, Defendant Officers also coerced a witness, Adrian Grimes, into falsely stating that he had seen Mr. Taylor near the crime scene just prior to the murders; Grimes later recanted the identification. (*Id.* ¶¶ 41–42.) They attempted unsuccessfully to coerce Ms. McCoy into falsely identifying Mr. Taylor in a lineup, and after she refused, falsely asserted that she had done so. (*Id.* ¶¶ 43–44.) Again, Defendants' did not disclose either incident of coercion to the prosecution, the Plaintiff's defense attorneys, or the court, nor did they disclose the fabrication of Ms. McCoy's purported positive identification. (*Id.* ¶¶ 42, 44.) Defendant Officers therefore conspired unlawfully to frame Plaintiffs and others for the murders of Mr. Lassiter and Ms. Haugabrook, and did so by fabricating inculpatory evidence, withholding exculpatory evidence, coercing false confessions

3

and a false positive identification, and committing perjury during hearings and trials. (*Id.* ¶¶ 56–57.)

Ultimately, Plaintiffs were convicted of first-degree murder and sentenced to 30 years' imprisonment on March 20, 1995 on the bases of their coerced statements, Adrian Grimes' coerced statement, Ms. McCoy's fabricated statement, and Defendant Officers' suppression of Mr. Anderson's statement. (*Id.* ¶ 49; Reply Br. at 10.) Plaintiffs allege that there was no physical evidence nor any eyewitness testimony connecting them to the murders. Plaintiffs' convictions were vacated in June 2014. (*Id.* ¶ 52.) Daniel Taylor and Deon Patrick have also been exonerated, the charges against Akia Phillips and Joseph Brown were dismissed before trial, and Rodney Mathews was acquitted by a jury. (Compl. ¶¶ 51, 53.) This conspiracy was not an isolated occurrence, Plaintiffs assert, but rather part of the City of Chicago's policies and practices of pursuing wrongful convictions through a variety of unlawful means. (*Id.* ¶ 60.) These policies and practices were "consciously approved" at the highest levels of policymaking authority. (*Id.* ¶¶ 60–71.)

Plaintiffs filed this action on November 21, 2014, each having served 15 years in prison and three years on supervised release for murders of which he was innocent. (*Id.* ¶ 72.)

## **LEGAL ANALYSIS**

On a motion to dismiss, the court presumes the truth of all well-pleaded factual allegations in the complaint and draws all reasonable inferences in plaintiffs' favor. *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015). The complaint alleges that Defendant Officers violated Plaintiffs' Fifth Amendment protection against self-incrimination by coercing false confessions (Count I); violated their Fourteenth Amendment due process rights by fabricating or coercing inculpatory evidence and withholding exculpatory evidence, resulting in Plaintiffs' wrongful convictions and imprisonment (Count II); failed to intervene to prevent violations of Plaintiffs' constitutional rights (Count III); advanced a malicious prosecution of Plaintiffs in violation of state law (Count V); intentionally inflicted emotional distress upon Plaintiffs, also in

violation of state law (Count VI); and engaged in an unlawful civil conspiracy under state law (Count VII). (Compl. ¶¶ 74–90, 96–111.) Against Defendant City of Chicago, Plaintiffs pursue theories of liability under *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978) (Count IV), and the state law doctrine of *respondeat superior* liability (Counts VIII and IX). (Compl. ¶¶ 91–95, 112–117.) Defendants move to dismiss the complaint in its entirety.

The Civil Rights Act, 42 U.S.C. § 1983, creates civil liability for any person who, under color of law, deprives someone of "any rights, privileges, or immunities secured by the Constitution and laws." Counts I, II, III, and IV of Plaintiffs' complaint allege constitutional tort claims pursuant to § 1983, while Counts V, VI, VII, VIII, and IX assert theories of liability under Illinois law. This court first considers the sufficiency of Plaintiffs' substantive claims and then addresses claims asserting liability against the City.

I. **Count I (Fifth Amendment Violations)**

In Count I, Plaintiffs allege that Defendants individually and jointly forced Plaintiffs to incriminate themselves falsely, in violation of their rights under the Fifth and Fourteenth Amendments. Defendants contend that Plaintiffs' coerced confession claim is time-barred and must therefore be dismissed. The applicable limitations period for § 1983 actions brought in Illinois is two years. *Wallace v. Kato*, 549 U.S. 384, 387 (2007) (citing 735 Ill. Comp. Stat. 5/13-202). That means, according to Defendants, that Plaintiffs' various claims under § 1983 became untimely in 1997 (two years after their respective convictions). However, Plaintiffs point to *Heck v. Humphrey*, in which the Supreme Court held that, "in order to recover damages for allegedly unconstitutional conviction or imprisonment . . . a § 1983 plaintiff must prove that the conviction or sentence has been" reversed or vacated, expunged by executive order, or called into question by a federal court's issuance of a habeas corpus writ. 512 U.S. 477, 486–87 (1994). *Heck* thus bars a would-be § 1983 plaintiff from bringing suit until the validity of his conviction has been in some way impugned; if judgment in favor of a plaintiff "would necessarily imply the invalidity of" a conviction or sentence that has *not* been so impugned, the complaint

5

must be dismissed. *Id.* at 487. Therefore, Plaintiffs argue, they were barred from bringing suit before their convictions were vacated in 2014.

Defendants are correct that *Heck* does not bar litigation involving any coerced confession claim until a plaintiff has been exonerated "because misconduct by the police does not (at least, need not) imply the invalidity of any particular conviction." *Moore v. Burge*, 771 F.3d 444, 446 (7th Cir. 2014) (citing *Wallace*, 549 U.S. 384; *Rollins v. Willett*, 770 F.3d 575 (7th Cir. 2014); *Booker v. Ward*, 94 F.3d 1052 (7th Cir. 1996)). Although "[t]hese decisions deal with the Fourth Amendment's rule against unreasonable searches and seizures," the Court of Appeals explained in *Moore*, "their holdings are equally applicable to contentions that police tortured suspects during interrogation, because that misconduct is actionable . . . whether or not any statement is used in evidence at trial." 771 F.3d at 446. But where a § 1983 plaintiff's confession "figured prominently in the court's decision" on guilt and/or sentencing, the validity of the conviction or sentence can be deemed to stand or fall with the validity of the confession, and so *Heck* bars suit as long as the conviction survives. *See Matz v. Klotka*, 769 F.3d 517, 531 (7th Cir. 2014). Plaintiffs invoke this rationale, observing that their coerced confessions were the central (indeed, the only) evidence in support of their convictions.

In a recent § 1983 action in this district brought by Mr. Taylor against many of these same defendants, the court attempted to discern the boundary between situations where coerced confession claims are *Heck*-barred (as in *Matz*) and those in which they are not (as in *Moore*). The court determined that *Moore* "appears to describe something other than the archetypal Fifth Amendment coerced confession claim, such as the one alleged here, which requires a self-incriminating statement and use of the statement in a criminal proceeding." *Taylor v. City of Chicago*, 80 F. Supp. 3d 817, 825 (N.D. Ill. 2015). The court noted that the Court of Appeals had expressly noted in *Moore* that the plaintiffs "stress the injuries they say they suffered at the hands of the police before judicial proceedings began," and reasoned that the usual *Heck* question of "whether the civil claim . . . necessarily impugns the validity of the

6

conviction" governs traditional coerced confession claims under § 1983. *Id.* at 25 (citing *Moore*, 771 F.3d at 446; *Tillman v. Burge*, 813 F. Supp. 2d 946, 970 (N.D. Ill. 2011)) (internal quotation marks omitted). "To the extent that the plaintiffs . . . [contend] . . .that police violated their rights by giving false testimony, or that during trial prosecutors withheld material exculpatory evidence about misconduct during their interrogations,'" *Heck* "bars relief until a conviction is set aside." *Taylor*, 80 F. Supp. 3d at 825.

This court finds the *Taylor* court's reasoning persuasive. Plaintiffs here have alleged that their confessions figured prominently in their respective convictions, and point to the trial court's stated reliance on the truthfulness of their statements to the police as well as its stated disbelief of Mr. Gardner's attempts in testimony to minimize his culpability. (Reply Br. at 7–8.) This court "is entitled to take judicial notice of matters in the public record" even at the dismissal stage, *Palay v. United States*, 349 F.3d 418, 425 n.5 (7th Cir. 2003), and holds that Plaintiffs have adequately pleaded the significance of their confessions at trial. Defendants' motion to dismiss Count I is denied.

## II.    Count II (Due Process Violations)

Count II alleges a denial of due process in violation of 42 U.S.C. § 1983. Plaintiffs allege that Defendant Officers failed to disclose James Anderson's statement that Daniel Taylor was in jail with him at the time of the murders. Nor did they disclose (1) the coercive techniques used to extract a positive identification of Taylor from Adrian Grimes and to obtain confessions from Plaintiffs' codefendants or (2) the truth about Ms. McCoy's supposed positive identification. Defendants urge that these alleged failures are not actionable because they are not *Brady* violations. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that suppression by government of material evidence "favorable to an accused" violates due process). They also argue that the Officers' various fabrications of evidence, which included a false police report that Mr. Taylor was out and about at 9:30 p.m. on the night of the murder and the false assertion about Ms. McCoy's positive identification, are not actionable under § 1983 as due process

7

violations, but rather constitute grounds for a state law malicious prosecution claim (which Plaintiffs have brought as Count V).

Defendants' second argument is easily disposed of under binding circuit precedent. The Court of Appeals has recently clarified that a claim of evidence fabrication can form the basis of a § 1983 due process claim, but only if the plaintiff suffered a deprivation of liberty as a result. *See Saunders-El v. Rohde*, 778 F.3d 556, 560–61 (7th Cir. 2015) (holding that plaintiff's evidence fabrication claim sounded in state law malicious prosecution action rather than § 1983 suit because he was acquitted). This principle derives from the text of the Due Process Clause itself, which prohibits any state from depriving "any person of life, *liberty*, or property, without due process of law." U.S. CONST. AMEND. XIV, § 1 (emphasis added). Defendants are correct that police officers are immune from § 1983 liability for their perjured testimony under *Briscoe v. LaHue*, 460 U.S. 325 (1983), such that Defendant Officers' false testimony cannot serve as the basis of a due process claim in this case. Plaintiffs' allegations go beyond a claim of false testimony however; they assert that Defendant Officers' conduct exceeds the scope of their immunity because it included fabrication of false evidence (such as police reports). Thus, at least to the extent Plaintiffs—who, of course, were deprived of liberty when they were imprisoned—have alleged that Defendant Officers fabricated non-testimonial evidence, they have adequately pleaded a due process violation.

The *Brady* question is a more complex one. "To succeed on a *Brady* claim, a plaintiff must show that: (1) the suppressed evidence is either exculpatory or impeaching and is favorable to the accused; (2) the government, either willfully or inadvertently, suppressed the evidence; and (3) the suppressed evidence resulted in prejudice." *Petty v. City of Chicago*, 745 F.3d 416, 423 (7th Cir. 2014). More concisely, a plaintiff must show that the government (either through the police or the prosecution) withheld favorable evidence in a manner that "undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

8

Plaintiffs likely have no *Brady* claim with respect to Defendant Officers' failure to disclose the brutal, coercive nature of Plaintiffs' own police interrogations, as Plaintiffs themselves were aware of this misconduct. *See Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006) ("Teresa knew herself what occurred during the interrogation, and the police were under no *Brady* obligation to tell her again that they coerced her into confessing."). Plaintiffs do assert that they had a constitutional right to know of the coercive techniques which Defendant Officers used to extract confessions from their codefendants, as well as to extract a positive identification from Adrian Grimes. On this score, the *Petty* case is dispositive. In that case, the Court of Appeals held that police officers' nondisclosure of coercive acts used to obtain incriminating evidence from people other than the plaintiff sounds in malicious prosecution rather than due process, since the officers' coercive conduct "may have violated the witness's rights, but it did not violate the arrestee's due process rights." 754 F.3d at 422 (citing *Buckley v. Fitzsimmons*, 20 F.3d 789, 794 (7th Cir. 1994)). Thus, Defendant Officers' nondisclosure of their treatment of Plaintiffs' codefendants and Adrian Grimes does not amount to a *Brady* violation, though it could support Plaintiffs' Count V allegations. *See Taylor*, 80 F. Supp. 3d at 826.

Defendants also contend that the truth about Ms. McCoy's refusal to identify Mr. Taylor in a lineup and Daniel Taylor's whereabouts (that is, a lockup, rather than in the vicinity of Mr. Lassiter's apartment as the falsified police report claimed) were "available to [Plaintiffs] through the exercise of reasonable diligence" at the time of trial, and so do not constitute possible *Brady* violations. *See Ienco v. Angarone*, 429 F.3d 680 (7th Cir. 2005) (citing *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002); *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001)). Yet as Plaintiffs note, defense attorneys routinely advise their clients not to talk to their codefendants, and at this early stage of this litigation (in which discovery has not yet begun), there are no facts or evidence that supports the contention that Plaintiffs knew or could have known that Taylor was in police custody at the time of the murders, let alone the name and contact information of

9

his cellmate. As the Court of Appeals has put it, "[w]e regard as untenable a broad rule that any information possessed by a defense witness must be considered available to the defense for *Brady* purposes. . . . Sometimes, a defense witness may be uncooperative or reluctant. Or, the defense witness may have forgotten or inadvertently omitted some important piece of evidence previously related to the prosecution or law enforcement." *Boss*, 263 F.3d at 740.

Nor is there anything in the record to suggest that Plaintiffs' criminal defense attorneys could have or should have contacted Ms. McCoy to verify that she had actually identified Taylor. Plaintiffs are correct that Defendants' argument depends on factual conclusions that cannot be made until the record has been developed in this case. Similarly, Defendants' contention that Count II should be dismissed because Plaintiffs have not yet proven that the fabricated evidence was used against them at trial is premature. At this early juncture, Plaintiffs have adequately pleaded plausible *Brady* violations by Defendant Officers. For this reason, and because Plaintiffs have alleged that "CPD officers manufactured evidence that they knew to be false," *Petty,* 645 F.3d at 423, Count II survives dismissal.

### III. Count III (Failure to Intervene)

In Count III, Plaintiffs charge Defendant Officers under § 1983 with failure to intervene to prevent violations of Plaintiffs' constitutional rights. Defendants argue two grounds for dismissal of this claim: (1) that this count arises entirely from deficient constitutional claims, *see Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation"), and (2) that it is time-barred. The court has already concluded that Counts I and II are sufficient to state claims that Plaintiffs' constitutional rights were violated. Plaintiffs allege that Defendants were either directly involved in those violations, or failed to take action to prevent them.

The argument that Plaintiffs' claims are time-barred merits only brief discussion. Defendants cite only one case, an unpublished 2004 district court opinion, for the proposition that failure-to-intervene claims are not *Heck*-barred until a conviction's validity is impugned.

*See Hobley v. Burge*, 2004 WL 1243929, *5–6 (N.D. Ill. June 3, 2004) (holding that plaintiff's excessive force and failure-to-intervene claims were not *Heck*-barred and so were untimely). As the *Hobley* court itself observed, however, a claim of failure to intervene to prevent excessive force would be barred by the *Heck* doctrine if "all evidence that indicates guilt would be wiped out by success on plaintiff's excessive force or failure to intervene claims." *Id.* at 6, *citing Wiley v. City of Chicago*, 361 F.3d 994, 997–98 (7th Cir. 2004) (holding that, where plaintiff was convicted on sole basis of fabricated evidence, false arrest claim was *Heck*-barred). While the case law appears to be largely undeveloped on the specific question of when failure-to-intervene claims in particular are *Heck*-barred, this court holds that because Count I was *Heck*-barred, Count III—which rests heavily on the allegations of coerced confession allegations—was as well, and so cannot be dismissed as untimely.

## IV. Count VI (Intentional Infliction of Emotional Distress)

Count VI is a state law claim for intentional infliction of emotional distress ("IIED"). Defendants urge that this state law claim is subject to a one-year statute of limitations under Illinois law and therefore must be dismissed as untimely. *See* 745 Ill. Comp. Stat. 10/8-1. On this score, Defendants are on solid ground. The Court of Appeals has held "that a claim of intentional infliction of emotional distress in the course of arrest and prosecution accrues on the date of arrest." *Bridewell v. Eberle*, 730 F.3d 672, 678 (7th Cir. 2013) (citing *Evans v. City of Chicago*, 434 F.3d 916, 934 (7th Cir. 2006)). Nor can an IIED claim be treated as a continuing violation for limitations purposes. *See Bridewell*, 730 F.3d at 678. Plaintiffs contend that *Bridewell* is distinguishable because in that case the plaintiff had pleaded guilty to a separate drug charge and thereby avoided prosecution for murder, or because that plaintiff's IIED claim did not incorporate her malicious prosecution claim.

But the specific fact pattern of *Bridewell* was irrelevant to the Court of Appeals' decision. Rather, the court stated a general rule regarding the limitations period for IIED claims, and this is how district courts have consistently interpreted *Bridewell*, even when malicious prosecution

11

and IIED claims are intertwined. *See, e.g.*, *Chatman v. City of Chicago*, 2015 WL 1090965, *9 (N.D. Ill. Mar. 10, 2015); *Taylor*, 80 F. Supp. 3d at 828; *Hill v. City of Chicago*, 2014 WL 1978407, *3 (N.D. Ill. May 14, 2014); *Bamberg v. City of Evanston*, 2014 WL 1612710, *4 (N.D. Ill. Apr. 16, 2014). A successful IIED claim would not necessarily have impugned Plaintiffs' convictions, *see Moore*, 771 F.3d at 446 ("[M]isconduct by the police does not (at least, need not) imply the invalidity of any particular conviction."). Accordingly, it appears that Plaintiffs' IIED claim could have been filed (that is, it was not *Heck*-barred) even before their convictions were vacated. Nor is the court willing to adopt Plaintiffs' proposed narrow interpretation of *Bridewell*, a case which appeared to interpret Illinois' one-year statute of limitations as universally applicable to IIED claims. For these reasons, Count VI must be dismissed.

## V. Count VII (Civil Conspiracy)

Count VII is a state law conspiracy claim. Defendant Officers seek dismissal of that count because it derives from constitutional allegations which they deem inadequately pleaded. Again, because the court has already concluded that Plaintiffs' allegations are sufficient to state constitutional claims, the argument for dismissal of the conspiracy allegation on this basis fails. Defendant City of Chicago, on the other hand, argues that Plaintiffs have not adequately pleaded sufficient independent facts in support of this claim. The City suggests that, like the plaintiff in *Cooney v. Rossiter*, 583 F.3d 967 (7th Cir. 2009), Plaintiffs have failed to make anything more than a bare allegation of conspiracy. *See id.* at 970 (holding that plaintiff failed to allege any facts tying private party defendants to state actor). This court disagrees. If the complaint's allegations are true, then it appears obvious that a conspiracy among Defendant Officers to frame Plaintiffs and secure their wrongful convictions occurred. As in *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012), "[i]t is a challenge to imagine a scenario in which" Defendant Officers' alleged evidence fabrication, *Brady* violations, and otherwise lawless behavior "would not have been the product of a conspiracy." Plaintiffs' conspiracy allegations

are sufficient under the federal courts' plausibility-in-pleading standard, *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and so Count VII survives dismissal.

## VI. Counts IV, VIII, and IX (Liability for the City)

Finally, the court turns to Plaintiffs' claims for municipal liability for the alleged violations of § 1983 and state law. Defendants urge dismissal of these claims not because Plaintiffs have failed to plead sufficient facts for the City to be held liable for Defendant Officers' torts, but rather because Defendants again assert that these torts are deficiently pleaded. *See, e.g., City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding that *Monell* liability for a municipal corporation is inappropriate "when in fact the jury has concluded that the officer inflicted no constitutional harm"). This court has already declined to dismiss Counts I (coerced confessions), II (due process), III (failure to intervene), and VII (conspiracy), and Defendants have offered no other reason for dismissal of Plaintiffs' *Monell* and vicarious liability theories. Counts IV, VIII, and IX survive this motion.

## VII. Supplemental Jurisdiction

Finally, Defendants argue that, since Plaintiffs have not (in Defendants' view) set forth viable federal law claims under § 1983, this court should decline to exercise its supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(c). Again, because this court has declined to dismiss any of Plaintiffs' § 1983 claims, the exercise of supplemental jurisdiction over the remaining state law claims—Counts V, VII, VIII, and IX, with only Count VI having been dismissed—is appropriate.

## **CONCLUSION**

Defendants' motions to dismiss [33, 35] are granted in part and denied in part. The motions are denied with respect to Counts I, III, IV, V, VII, VIII, and IX and granted with respect to Count VI. To the extent Count II advances a due process claim regarding the coercion of third parties, it is dismissed, but that count otherwise survives this motion, as well. Defendants

13

are directed to answer the complaint within 21 days. A Rule 16 conference is set for November 3, 2015, at 9:00 a.m.

ENTER:

Dated: September 24, 2015

_____
REBECCA R. PALLMEYER
United States District Judge