| | |
|---|---|
| **PAUL PHILLIPS and LEWIS GARDNER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **No. 14 C 9372** |
| | ) |
| **CITY OF CHICAGO, CHICAGO POLICE** | ) **Judge Rebecca R. Pallmeyer** |
| **OFFICERS ANTHONY VILLARDITA # 20849,** | ) |
| **THOMAS JOHNSON #20820, BRIAN** | ) |
| **KILLACKY #20748, TERRY O'CONNOR** | ) |
| **#20831, RICK ABREU #20796, ROBERT** | ) |
| **DELANEY #20383, SEAN GLINSKI** | ) |
| **#3122, MICHAEL BERTI #12881,** | ) |
| **UNIDENTIFIED EMPLOYEES OF THE CITY** | ) |
| **OF CHICAGO, and ESTATE OF ROBERT** | ) |
| **HEYRMAN,** | ) |
| | ) |
| **Defendants.** | ) |

## AMENDED MEMORANDUM OPINION AND ORDER

Plaintiffs Lewis Gardner and Paul Phillips were convicted of murder in 1995. Nearly twenty years later, they successfully petitioned to have their convictions vacated—apparently based on doubts about the reliability of their confessions, although the record is oddly silent on the exact circumstances of their exoneration. Gardner and Phillips now bring this action against the City of Chicago and nine Chicago police officers pursuant to 42 U.S.C. § 1983 and Illinois law, alleging, *inter alia*, deprivations of their constitutional rights, malicious prosecution, and civil conspiracy. The officers and the City have moved for partial summary judgment on certain claims directed against them. As explained below, the motions are granted in part and denied in part. Defendants are entitled to summary judgment on Plaintiffs' claims for the suppression of exculpatory evidence and for the failure of the now-deceased Officer Robert Heyrman to intervene to prevent the violations of Plaintiffs' rights. But because genuine disputes remain as to facts that are material to Plaintiffs' claims of evidence fabrication and malicious prosecution, the court denies Defendants' motions with regard to those claims.

# BACKGROUND

## I. The initial police investigation

On November 16, 1992, at approximately 8:43 p.m., Jeffrey Lassiter and Sharon Haugabook were shot and killed inside Lassiter's second-floor apartment, located at 910 W. Agatite Ave. in Chicago, Illinois. (Def. Officers Statement of Material Facts (hereafter "DSOF") [107], at ¶ 21.) Within minutes, police arrived at the scene, where a neighbor named Faye McCoy told them she had seen four African-American men leave Lassiter's building shortly after the shootings. (*Id.* at ¶ 22.)

Detectives Anthony Villardita and Thomas Johnson, both Defendants here, visited the crime scene that evening and spoke with Faye McCoy. (*Id.* at ¶ 24; Villardita Dep. 94-95, Ex. 6 to DSOF.) The parties dispute exactly what McCoy told the detectives. Plaintiffs claim, and McCoy has testified, that she told the detectives that one of the men she had seen leaving Lassiter's building was Dennis Mixon, a.k.a. "Goldie," whom she knew as a drug dealer from Chicago's West Side and whom she had previously warned to stay away from her teen-age daughter. (Pls.' Statement of Material Facts: Individual Defs. (hereafter "PSOF") [118], at ¶ 3-5; McCoy 2015 Dep. 54-56, Ex. 3 to PSOF.) Johnson denies that McCoy identified Mixon on the night of the murders. (Johnson Dep. 494-95, Ex. 7 to DSOF.) Villardita recalls that McCoy described the four men she saw leaving Lassiter's building but did not identify any of them by name. (Villardita Dep. 107-110.) The Defendant-officers admit, however, that "a couple days after the murders," the detectives showed McCoy several photographs, including one of Mixon, and that McCoy identified Mixon as one of the men she saw leave Lassiter's building shortly after the murders. (Defs.' Resp. to PSOF [134], at ¶ 5.)

## II. Plaintiffs' activities on November 16, 1992

Plaintiff Paul Phillips was seventeen years old in November 1992. (Phillips Aff. ¶ 2, Ex. 1 to PSOF.) He lived in an apartment located at 854 W. Agatite Ave. with his mother, his nineteen-year-old brother Dion (a.k.a, "Akia"), and several other people. Seventeen-year-old

Daniel Taylor stayed at the apartment sometimes, as did Plaintiff Lewis Gardner, who was fifteen. (*Id.*; DSOF ¶ 13; PSOF ¶¶ 16, 23.)

Paul Phillips has testified that at around 5:00 or 5:30 p.m. on November 16, 1992, he left his house to "see . . . where was everybody else at." (Phillips Dep. 114, Ex. 7 to PSOF.) He walked to the Clarendon Park field house, where he watched people playing basketball in the gym until approximately 6:00 p.m. (*Id.* at 117.) Phillips then decided to return home, but when he left the field house, he ran into two friends named Mohammed and Kerrick. (*Id.* at 119.) Mohammed, who lived in Phillips' building, told Phillips that he had recently been beaten up by a group of people now standing across the street. (*Id.* at 133, 119-121.) As Phillips was speaking with Mohammed and Kerrick, Daniel Taylor walked up and joined the conversation. (*Id.* at 121-22.) The four decided to confront the group across the street, and while the groups were exchanging words, a marked police car emerged from an alley nearby. (*Id.* at 125.) Phillips warned his friends about the police and they started to run away. (*Id.* at 128.) Phillips, Mohammed, and Kerrick managed to escape, but officers grabbed Taylor and placed him on the hood of the squad car. (*Id.* at 132-33.) Phillips ran straight home and did not see what happened to Taylor next. (*Id.* at 133.) Once home, Phillips turned on the television and watched the Fresh Prince of Bel-Air, Blossom, and Monday Night Football. (*Id.* at 135-37.)[1] Phillips' mother was home at the time, along with her friend Elizabeth Reed and Reed's son. (*Id.* at 139-40.)

At some point after 8:00 p.m., Phillips' friend Mark Tillis knocked on the door and Phillips invited him inside. (*Id.* at 140.) The two ate ice cream and watched football for a few minutes. (*Id.* at 141-43.) Around 8:20 p.m, Phillips received a phone call from his upstairs neighbor April. (*Id.* at 143.) April suggested that Phillips and Tillis go to the back porch of Phillips' apartment, where they could see and talk to her through her window. (*Id.* at 143-45.) April also told Phillips

---

[1]     The court takes judicial notice of the fact that these programs were scheduled to air at 7:00, 7:30, and 8:00 p.m. CST, respectively, on the night of November 16, 1992. *See TV Highlights*, CHI. TRIB., Nov. 16, 1992, § 5, at 6; FED. R. EVID. 201(b)(2).

that her parents were not home and that she "wanted me to come up there and probably, you know, fool around with her." (*Id.* at 145.) Phillips told April that she would have to wait until Tillis left his house. (*Id.* at 145-46.) Phillips and Tillis went outside to Phillips' back porch, where they played with a Nerf basketball hoop and talked with April for around forty minutes. (*Id.* at 146-48.)

Around 9:00 p.m., Tillis missed a shot and went downstairs to retrieve the ball. (*Id.* at 147, 150.) While Tillis was gone, Elizabeth Reed called to Phillips to come inside. (*Id.* at 149.) Phillips returned to the apartment and was immediately confronted by several police officers. (*Id.* at 150.) According to Phillips, the officers told him to "freeze." While he stood in the dining room, they entered his bedroom and found a small bag of drugs in his coat pocket. (*Id.* at 151.) The police then brought Phillips' mother into the dining room. (*Id.* at 155, 157.) Phillips says he told the police that the drugs were his but the officers responded that "since I was only 17 and [his mother] was the legal guardian of the house, then they got to charge that on her." (*Id.* at 159.) Phillips' mother was arrested and escorted from the apartment. (DSOF ¶ 19; Pls.' Resp. to DSOF ¶ 19-20.)

A police report on the incident, dated November 18, 1992, states that on November 16 the officers were responding to reports of gunfire at Lassiter's apartment building when they observed Mark Tillis "standing at the mouth of the alley." (Police Report of Nov. 18, 1992, Ex. 40 to PSOF.) The officers approached Tillis, who "began running eastbound through the alley to the rear of 854 W. Agatite." (*Id.*) Police followed Tillis, who was reportedly "yelling the police are chasing me," into "an open apartment door on the second floor." (*Id.*) At that point, the officers "clearly observed a female black, now known as [Phillips' mother], sitting at the dining room table attempting to hide numerous plastic packets which were scattered on the table." (*Id.*) Police arrested both Phillips' mother and Mark Tillis. (*Id.*) The report concludes by noting that "further investigation revealed [Tillis] had no knowledge" of the shootings to which the officers had originally responded. (*Id.*)

At some point on the night of November 16, after the police left Phillips' apartment, Daniel Taylor showed up there. (DSOF ¶ 20.) Taylor told Phillips that he "just got out," and Phillips assumed this meant that Taylor had been arrested following the altercation earlier that day and had come straight from police custody to the apartment. (Pls.' Resp. to DSOF ¶ 21; Phillips Dep. 187.) Phillips maintains that he did not learn of the shooting that took place at Jeffrey Lassiter's apartment at any point on the night of November 16, 1992. (Phillips Dep. 176.)

Plaintiff Lewis Gardner did learn of the Lassiter-Haugabook murders on the night of November 16. He has testified that he spent the morning of November 16, 1992, selling drugs on the 800 block of Agatite Ave. to "whoever come up and ask" for them. (Gardner Dep. 85-90, Ex. 8 to PSOF.) He recalls that he ate lunch at a restaurant in the neighborhood around noon, and then, when it got dark, went to his mother's apartment, located at 4408 N Hazel St., to play with his nephew and to give his sister money for diapers and other childcare expenses. (*Id.* at 90-92.) Gardner does not remember what he did between noon and the time he went to his mother's apartment, though he maintains that he did not go to Clarendon Park that day. (*Id.* at 92.) At some point after dark, while he was at his mother's apartment, Gardner remembers noticing "a lot of commotion" outside—"like ambulances and police cars and fire trucks coming past." (*Id.* at 95.) He went outside and followed the commotion around the corner to the 900 block of Agatite Ave., where he remembers "see[ing] them bringing bodies out." (*Id.* at 100.) After police told Gardner and other onlookers to leave the area, he went back to his mother's apartment. (*Id.* at 103-04.) He believes he stayed at his mother's apartment that night (*id.* at 104), and he maintains that he did not hear anything further about the Lassiter-Haugabook shootings until more than two weeks later. (*Id.* at 107-08.)

### III.    Police get a break in the case

Between November 16 and November 29, Detectives Villardita, Johnson, and others examined the crime scene, spoke to the victims' family and friends, located additional

witnesses, and assembled and presented photo arrays to those witnesses. (DSOF ¶ 25.) Their efforts to locate Dennis Mixon, however, were unsuccessful. (Defs.' Resp. to PSOF at ¶ 6), On November 29, Villardita and Johnson created a report on the status of their investigation. (GPR of Nov. 29, 1992, Ex. 5 to PSOF.) This report concluded by identifying several "THINGS TO DO," including "[c]lear this case by the time we come back from our days off." (*Id.*) Plaintiffs characterize this sentence as an "instruction" to Villardita and Johnsons's colleagues. (PSOF ¶ 6.) Villardita has testified that the sentence was a "joke" and was "not to be taken serious." (Villardita Dep. 191-92.) Johnson agrees that "[i]t's just internal humor that we—we do . . . . We can't command anybody to clear a case." (Johnson Dep. 162-63.)

As late as December 2, 1992, the police had no evidence linking Plaintiffs Gardner or Phillips to the Lassiter-Haugabook murders. (PSOF ¶ 6; Defs.' Resp. to PSOF ¶ 6.) But that soon changed. Early in the morning on December 2, Paul Phillips received a phone call at his home from a man who identified himself as "Ed." (Defs.' Resp. to Pl.'s Am. Statement of Facts [141], at ¶ 7.) According to Phillips, Ed said there were people outside looking for drugs, and that if Phillips and his friends wanted to earn some money, they should go outside immediately. (*Id.*) Phillips testified at his deposition that he had never received a call like this before, and that he did not (and still does not) know Ed. (Phillips Dep. 218-19.) Nevertheless, Phillips explains, he assumed at the time that "it was just one of the guys around the neighborhood calling" and therefore he did not find the call unusual. (*Id.* at 218.) He told his brother Dion and Plaintiff Gardner (who had slept at Phillips' apartment the previous night) "that Ed called and said that people was looking for drugs and that it's a good time to make some money." (*Id.* at 220; Gardner Dep. 115.) Dion and Gardner both responded "okay," and a few minutes later the three teenagers went outside together. (*Id.* at 220-23.) Phillips asserts that he was not carrying any drugs but that Dion and Gardner each carried "deodorant bottles" containing crack cocaine. (*Id.* at 220, 228.) Gardner recalls that he was carrying the drugs in "a little pill bottle." (Gardner Dep. 115-16.)

The record is unclear as to precisely what happened next, but it is undisputed that Dion, Paul, and Gardner were all arrested and brought to the 23rd District police station shortly after they left the apartment. (Defs.' Resp. to Pls.' Am. Statement of Facts ¶ 7.) The police charged Paul with disorderly conduct and released him from custody while it was still light outside. (*Id.*; Phillips Dep. 241-43.) Gardner and Dion were charged with drug possession, and Gardner's mother left work to come to the police station after officers informed her via telephone that her son was in custody. (Defs.' Resp. to Pls.' Am. Statement of Facts ¶ 7.) Gardner's mother and the officers each tried to persuade Gardner to reveal the identity of his drug supplier. (Defs.' Resp. to PSOF ¶¶ 8-9.) Gardner refused, and at some point on December 2 police transported both him and Dion to the Area 6 detective division, located at Belmont Ave. and Western Ave., for further questioning. (Defs.' Resp. to PSOF ¶¶ 8-9, 17.) Gardner's mother rode in the police car with him to Belmont and Western. (Gardner Dep. 137.) Gardner's mother then left to return to work (PSOF ¶ 9),[2] and Gardner was placed in a conference room to wait for detectives to speak with him. (*Id.* at ¶ 10.) Several hours later, at 3:20 a.m. on December 3, Gardner confessed to acting as a lookout stationed outside Lassiter's apartment building at the time Jeffrey Lassiter and Sharon Haugabook were murdered. (DSOF ¶ 27.)

According to his confession, Gardner attended a Vice Lords gang meeting behind the Clarendon Park field house at approximately 7:00 p.m. on November 16, 1992. (Gardner Statement 4, Ex. 10 to PSOF.) Also at this meeting were "C-Deon [Deon Patrick], Paul Phillips, D[i]on Phillips, Rock, Ed, Slick [Joseph Brown], T Mack, Black T [Daniel Taylor]," and "Cuzzo," as well as "Pookie" and "Goldie." (*Id.* at 5, 8-9.) Patrick showed the group a gun, told the group that "some people" who lived near Agatite and Hazel "owe me some money," and announced that he would shoot those people if they didn't pay him what they owed. (*Id.* at 12-14.) Rock then directed Gardner and others to "walk over to Agatite." (*Id.* at 13-14.) Patrick assigned

---

[2] Gardner recalls that someone at Belmont and Western told his mother "that she can go back to work, they want to ask me a couple of questions and she can come back and pick me up." (Gardner Dep. 137.)

Gardner, Paul Phillips, Dion Phillips, and Brown the role of lookouts, and directed them to "[y]ell five-0 real loud" if they saw the police. (*Id.* at 14.) Gardner stood at his assigned lookout post at the corner of Agatite and Hazel and watched Patrick, Rock, T-Mack, Goldie, and Taylor enter the back doorway of the building at 910 W. Agatite. (*Id.* at 17.) Although Gardner remained on the corner after the others entered the rear doorway of the building, he somehow saw the others "[go] up to the house . . . kick[] the door open, and start[] arguing with the people about the money." (*Id.* at 17-18.) Five or ten minutes later, Gardner heard four or five gunshots. (*Id.* at 18-19.) He then saw Patrick, Taylor, Rock, and T Mack (but not Goldie) "come running out the building." (*Id.* at 19.) He also heard C Deon say "Almighty"—which Gardner identified as "gang talk" for "we got the job done"—and heard Rock say "we took care of business, we outie." (*Id.* at 19-20.) The next day, on November 17, Gardner again met with Patrick, Dion Phillips, Paul Phillips, and Rock at the southeast corner of Hazel and Agatite, where he heard Patrick "talk[] about what happened when they went upstairs and killed the people." (*Id.* at 23.)

The first page of Gardner's confession lists Assistant State's Attorney Martin Fogerty, Detective Villardita, and "Youth Officer Heryman" [sic] as present at the time it was given. (Gardner Statement, Ex. 10 to PSOF.)[3] The final pages state that Gardner himself initiated the conversation with police about his knowledge of the murders, that no one "force[d]" him to speak about the murders or threatened him in any way, that no one promised him anything in exchange for the information he offered, that the police detectives treated him "good" and gave him a can of pop and a bag of chips, and that he gave the statement "freely and voluntarily" because "I feel guilty about it." (*Id.* at 24-26.)

Over the next two days, police obtained similar confessions from Dion Phillips, Paul Phillips, Deon Patrick, Daniel Taylor, Rodney Matthews, and Joseph Brown. (PSOF ¶¶ 17-35.) The parties dispute nearly everything about the circumstances in which police obtained these

---

[3]     Four signatures appear on the final page of Gardner's statement, one of which appears to be Gardner's and one of which appears to be that of Robert Heyrman. (Gardner Statement 26.)

confessions—including Gardner's. The court describes the parties' dueling accounts of each confession in turn.

### a. *Lewis Gardner*

Plaintiffs contend that neither Gardner nor the police officers who spoke with him at the 23rd District station said anything about murders. (PSOF ¶ 10.) Once Gardner arrived at the Area 6 facility, however, Detectives Villardita and Johnson "began to interrogate him, without a parent or youth officer, asking him did he know anything about the murders that happened on Agatite." (PSOF ¶ 10.) Gardner denied any knowledge of the murders, but the detectives repeatedly threatened to "put everything on [Gardner]" if he did not "tell [them] what happened." (*Id.*; Gardner Dep. 147.) At some point that night, the detectives left Gardner alone in the room for so long that he urinated in the corner and then fell asleep on the floor. (PSOF ¶ 11.) Although Gardner was not handcuffed during this time, he believed that he was under arrest. He says that "until somebody came back in I didn't know I could get up and knock on the door and walk to the door and say, 'Hey, I need to use the bathroom.'" (*Id.* at 155, 172.) Gardner maintains that an unidentified officer woke him up by kicking him hard enough that it caused him pain. (Gardner Dep. 156.)

Later, Gardner recalls, a male assistant state's attorney told Gardner "if you tell them something you can go home." (*Id.* at 159-60.) Gardner believed at the time that the state's attorney was *his* attorney. (*Id.*) Gardner says he believed this because "he told me"—that is, because the state's attorney told Gardner that he was Gardner's attorney. (*Id.* at 160.) It is unclear from the record when Gardner learned that this individual was not in fact his attorney.

At some point, Detectives Villardita and Johnson showed Gardner several photographs and asked him whether he knew the people depicted in them. (*Id.* at 164.) Gardner correctly identified Daniel Taylor, Paul Phillips, Rodney Matthews, Deon Patrick, and Joseph Brown, among others. (*Id.* at 161-62; PSOF ¶ 12.) The detectives left the room again and returned "a while" later with a spiral notebook containing several pages of handwritten text. They told

Gardner to read this text and put it into his own words. (Gardner Dep. 164-65.) Plaintiffs note that Gardner "was not a great reader" at the time, and that a psychiatrist later determined that he had a "performance IQ" of 65 and a "full scale IQ" of 70. (PSOF ¶ 16.) Gardner recalls that he "stared at [the notebook] for a while" and "read a few pages," but he struggled and the detectives had to read the text to him aloud, twice. (*Id.* at ¶ 13.) After doing so, the detectives left the room again and returned with a female court reporter. (Gardner Dep. 169.) The detectives asked Gardner a series of questions and told him to answer by rephrasing the text from the notebook "in my words." (*Id.* at 170.) Gardner says he did not have the notebook in front of him when he answered these questions, and that on several occasions he gave the "wrong answer." (*Id.* at 170-71.) At these times, either the detectives or the state's attorney would "tell the clerk to stop typing, and then have me say it again." (*Id.*) When Gardner was finished, the detectives told him to write several specific corrections on the printed transcript of his statement and directed him to write his initials on each page. (*Id.* at 184-87.)

Defendants deny virtually all of Gardner's account. They claim that while Gardner was still at the 23rd District station, he spontaneously told Officer Mark Forrest that he had information about the Lassiter-Haugabook murders. (Defs.' Resp. to PSOF ¶ 8; Forrest Dep. 153-55, Ex. 41 to DSOF.) According to Defendants, Gardner never denied having knowledge of the murders while he was being questioned at the Area 6 detective division, neither Villardita nor Johnson ever threatened or kicked Gardner while he was there, Gardner did not urinate in the corner of the room where he was waiting, and "[t]he detectives did not feed any information to Gardner about the details of the crime." (Defs.' Resp. to PSOF ¶¶ 10-14.) Rather, Defendants maintain that Gardner "voluntarily confessed to his involvement in the murders to Detectives Villardita and Johnson, and orally confessed to [Assistant State's Attorney] Fogarty." (Defs.' Resp. to PSOF ¶ 13.) Defendants also deny that Officer Heyrman was present when Gardner gave his confession, but they offer no alternative explanation for why Heyrman's name and signature appear on Gardner's confession.

### b.     Paul Phillips

As previously noted, Paul Phillips was arrested with Gardner and Dion Phillips on December 2, was brought to the 23rd District police station for processing, and was released with a disorderly conduct charge while it was still light out.  Around 1:30 a.m. on December 3, however, police re-arrested Phillips at his home and brought him to the Area 6 facility at Belmont and Western.  (PSOF ¶ 19; Defs.' Resp. to PSOF ¶ 19.)  The parties agree that police at Belmont and Western placed Phillips in a small room and left him there "for a while."  (PSOF ¶ 19; Defs.' Resp. to PSOF ¶ 19.)  The parties also agree that Detectives Villardita and Johnson interviewed Phillips, that Phillips initially denied knowing anything about the Lassiter-Haugabook murders, and that at some point on December 3 an unidentified officer took Phillips to another room to stand in a line-up with Rodney Matthews, Deon Patrick, and Daniel Taylor.  (PSOF ¶ 19; Defs.' Resp. to PSOF ¶ 19.)  The parties dispute the remaining details regarding Phillips' interrogation and confession.

Phillips has testified that the police told him that a witness "picked [him] out" during the lineup.  (Phillips Dep. 260.)  He states that a police officer then took him to another, larger room and handcuffed him to either a bar or a ring on the wall.  (*Id.* at 261-62.)  The room was dark, and as Phillips began to fall asleep, one or more officers came into the room, "hit" Phillips "to wake [him] up," and shined a flashlight into his eyes.  (*Id.* at 265-66.)  An officer demanded that Phillips tell him "who did the murder?" but Phillips denied knowing what the officer was talking about.  (*Id.* at 267.)  The officer or officers then left the room and Phillips fell asleep again.  (*Id.* at 268-69.)  At some point, the officer or officers returned, woke Phillips up by putting a "hand in [his] face" and shining a flashlight in his eyes, and asked him again, "who did the murder?"  (*Id.* at 270.)  Phillips again said he didn't know what the officer was talking about.  (*Id.*)  The officer or officers then left the room again and returned a third time, after an unidentified period of time, with Daniel Taylor.  As Taylor stood outside the open door, Phillips heard an officer ask "is that Paul?"  Taylor said "yes."  (*Id.* at 272.)  The officer then shut the door and told Phillips that

Taylor "pointed you out and said that you did this. . . . [Y]ou're going to jail for life. You will never—you will never see the streets again." (*Id.*) Phillips asked to speak to his mother, but the officer told him "you will never talk to your mother again." (*Id.* at 275.)

After that, an officer showed Phillips "some statement or something that people said that I was involved or something." (*Id.*) The officer took Phillips to another room and began "going over, like, the—the statements or the story . . . and was, like, kind of feeding me this information and stuff." (*Id.* at 284-85.) At 1:33 a.m. on December 4, more than twenty-four hours after police first brought Phillips to Belmont and Western, Phillips gave a transcribed statement in which he implicated himself and others, including Gardner, Taylor, Patrick, and Matthews, in the Lassiter-Haugabook murders. (PSOF ¶ 22.)

Defendants deny that anyone told Phillips that a witness had "picked" him in the lineup. (Defs.' Resp. to PSOF ¶ 19.) They also deny that an officer "displayed" Daniel Taylor to Phillips or asked Taylor to identify Phillips; that Phillips asked to speak with his mother and was told that he would never see her again; or that any officer "fed" information about the murders to Phillips. (*Id.* at ¶¶ 20-21.) Instead, according to Defendants, "the entire interview of Phillips conducted by detectives Villardita and Johnson lasted approximately twenty minutes." (*Id.* at ¶ 20.) In Defendants' version of events, the detectives read Phillips his *Miranda* rights, and then, after they told him that "his friends, fellow gang members, implicated him" in the murders, "Phillips orally confessed to the detectives and admitted to being a lookout." (*Id.*)

### c.    *Dion Phillips*

As noted, Dion Phillips was also arrested and taken to the 23rd District on December 2. Plaintiffs claim that Defendants Terry O'Connor and Rick Abreu interrogated Dion Phillips "at about the same time" that Detectives Villardita and Johnson interrogated Lewis Gardner. (PSOF ¶ 17.) Defendants deny this but the material they cite (Villardita's deposition testimony) is not inconsistent with it: Defendants point out that Detective Villardita testified that at the time Gardner confessed, Detectives O'Connor and Abreu "had either interviewed [Dion] Phillips or

were about to interview him." (Defs.' Resp. to PSOF ¶ 17.) The parties therefore are in agreement about the identity of the parties involved in Dion's interrogation and the approximate time at which it occurred. The parties also agree that Dion gave a confession that, like Gardner's, confirmed that he attended a gang meeting in Clarendon Park at 7 p.m. on November 16, 1992; that others attending the meeting included Gardner, Deon Patrick, Daniel Taylor, T Mack, and Goldie; that Dion acted as a lookout; that Dion saw Patrick and Taylor, among others, go into the courtyard of a building on Agatite, heard gunshots a few minutes later, and then saw the same people run out of the building; and that Dion heard Patrick say "Almighty." (PSOF ¶ 18; Defs.' Resp. to PSOF ¶ 18.) Dion gave his statement at approximately 6:31 a.m. on December 3. (Ex. 14 to PSOF.)

Plaintiffs contend that Dion was "placed in a room" at the Area 6 facility on December 2 and was "left there for a while" until "somebody came in the room and asked him questions about the murder on Agatite." (PSOF ¶ 17.) When Dion denied any knowledge of the murders, Plaintiffs claim, the officers "harassed" him into confessing. (*Id.*) Dion has testified that the officers who interrogated him that night beat him with flashlights and phone books and made him feel "like a slave." (Dion Phillips Dep. 173-74, Ex. 13 to PSOF.) Dion says he agreed to confess only after police gave him an "ass whipping"; promised him that, if he provided information, "it will be over as quick as possible"; and showed him Lewis Gardner's confession. (*Id.* at 172, 162, 182.) Dion maintains that his confession was "rehearsed" and "already written" by the police. (*Id.* at 163, 165.)

Defendants deny that officers beat, harassed, or threatened Dion Phillips before he confessed to playing a role in the murders. (Defs.' Resp. to PSOF ¶ 17.) Pointing to Detective Abreu's deposition, they also deny that officers made any "promises of leniency" to Dion in exchange for his confession. (*Id.*; Abreu Dep. 218, Ex. 48 to DSOF.)

### d.   Daniel Taylor

Police arrested Daniel Taylor at a facility for homeless youth at 2:15 a.m. on December 3, 1992.  (PSOF ¶ 23.)  The parties agree that Taylor was taken to the station at Belmont and Western and placed in a room to wait, and that Defendants Villardita and Killacky eventually entered the room and asked Taylor questions about the Lassiter-Haugabook murders.  (PSOF ¶ 23; Defs.' Resp. to PSOF ¶ 23.)  The parties also agree that, at 5:23 a.m. on December 3, Taylor gave a court-reported confession stating, *inter alia*, that Taylor pushed Sharon Haugabook to the floor inside Lassiter's apartment, at which point Deon Patrick shot Haugabook twice.  (PSOF ¶ 25; Taylor Statement 1, 15-16, Ex. 18 to PSOF; Defs.' Resp. to PSOF ¶ 25.)

The circumstances surrounding Taylor's confession are otherwise disputed.  Plaintiffs contend, and Taylor has testified, that Taylor was handcuffed to a ring on the wall of the room at Belmont and Western.  (PSOF ¶ 23; Taylor Dep. 240-41, Ex. 17 to PSOF.)  Plaintiffs claim that Villardita and Killacky asked Taylor repeatedly what he knew about "a murder," and Taylor responded that he knew nothing.  (Taylor Dep. 241.)  The detectives became "quite aggressive." (*Id.* at 246.)  Taylor swore at the officers and repeated that he didn't know anything about a murder.  (*Id.*)  Taylor recalls that the detective "with a thick mustache" hit Taylor with a flashlight on Taylor's left side, and the detective with "golden hair" punched Taylor on his torso several times.  (*Id.* at 247-48.)  The detectives told Taylor that he "was going to tell them what they wanted to know" and left the room for a period of time.  (*Id.* at 249.)   When they returned, they beat Taylor again, told him that they knew he was at "a meeting" on the night of the murder, and warned that people involved in the murder were saying that Taylor was with them.  (*Id.* at 250-54.)  Taylor eventually "got tired of the beatings and gave in to their wishes to tell them what they wanted to hear."  (*Id.* at 264.)[4]

---

[4]   As will be explained in greater detail below, Plaintiffs maintain that "it was impossible for Daniel Taylor to have participated" in either the alleged gang meeting on November 16, or the murders themselves, because Taylor was in police custody that night from

Defendants deny that Villardita and Killacky beat or threatened Taylor on December 3, or that the detectives supplied Taylor with any details about the murders before he admitted to his involvement. (Defs.' Resp. to PSOF ¶¶ 24-25; Killacky Dep. 304-06, Ex. 45 to DSOF.) They assert that "[t]he detectives' entire interview of Taylor at the detective area inside an interview room lasted fifteen to twenty minutes," and that Taylor admitted to his involvement in the murders after the detectives informed him that others had implicated him. (Defs.' Resp. to PSOF ¶ 25.)

### e. *Deon Patrick*

Police arrested Deon Patrick at his home around 11:30 p.m. on December 2, 1992. (Pls.' Am. Statement of Facts ¶ 27.) The parties agree that Patrick was taken to the police facility at Belmont and Western, where Detectives Abreu and O'Connor placed him in a room and questioned him about the Lassiter-Haugabook murders. (*Id.*; Defs.' Resp. to Pls.' Am. Statement ¶¶ 27-28.) Approximately 28 hours later, at 3:35 a.m. on December 4, Patrick signed a handwritten statement in which he admitted to helping plan the murders in a gang meeting at Clarendon Park and to shooting Lassiter in the head. (Patrick Statement 1-3, Ex. 56 to PSOF; Defs.' Resp. to PSOF ¶ 30.) The parties' accounts diverge from there.

Plaintiffs assert that Patrick was handcuffed to a ring on the wall of an interrogation room when he arrived at Belmont and Western on December 2. (Pls.' Am. Statement ¶ 27.) Detectives Abreu and O'Connor entered the room and asked Patrick about the murders, but Patrick denied having any knowledge of them. (*Id.*) The detectives then disclosed that Patrick's friends had implicated him, and Patrick responded by asking to speak with a lawyer. (*Id.* at ¶ 28.) The detectives didn't explicitly refuse this request, but they never brought Patrick a phone book or permitted him to make a phone call. (Patrick Dep. 334-35, Ex. 22 to PSOF.) Instead, the detectives left the room long enough for Patrick to fall asleep. (*Id.* at 339.) When

---

6:45 p.m. to 10:00 p.m. (PSOF ¶ 26.) Defendants deny that it was impossible for Taylor to have participated in either the gang meeting or the murders, and they cite Taylor's and his various co-defendants' confessions as evidence that he did. (Defs.' Resp. to PSOF ¶ 26.)

they returned, they showed Patrick the statements given to police by Lewis Gardner and Dion Phillips. (*Id.* at 342-48) Patrick continued to deny any involvement in the murders, and the detectives left the room again. (*Id.* at 348.) Later, Detective Villardita entered the room and told Patrick that he shouldn't "let [Gardner and Dion Phillips] send you down and they end up going home because everybody's putting everything on you." (*Id.* at 350.) Detective Abreu also told Patrick that he would "end up on death row," that he would "never see [his] kids again," and that if he cared about his kids he "should start talking." (*Id.* at 362.)

At some point, Plaintiffs continue, the detectives brought Daniel Taylor into Patrick's room. Patrick heard Taylor identify him as "C Deon" and tell the detectives that Patrick was "the guy that shot those people." (*Id.* at 363-64.) The detectives then left Patrick alone again, and while they were gone Patrick heard Rodney Matthews "yelling" from another room in the building. (*Id.* at 370.) When Detective Abreu returned, Patrick asked him, "why y'all doing that to him?" (*Id.*) Abreu replied by warning Patrick, "if you don't start talking, you're going to get the same thing." (*Id.* at 370.) Patrick was then placed in a lineup, after which Detective Abreu told Patrick that a witness had identified him "as being one of the people that came out of that apartment." (*Id.* at 375.) After the lineup, Patrick told Detective O'Connor that he was willing to make a statement. (*Id.*) O'Connor left the room and returned with State's Attorney Joe Magats and a court reporter. (*Id.* at 382-83.) As the court reporter was setting up her equipment, Patrick said "y'all about to make me confess to something I didn't do." (*Id.* at 383.) At that, Patrick contends, Magats escorted the court reporter out of the room. (*Id.*) Eventually, Patrick concluded that "I wasn't leaving that room, at least I wasn't going home from that room [until I confessed]," and that his best hope for avoiding death row was "to be placed in a setting that was unbiased [i.e., a courtroom]." (*Id.* at 394.) He states that "I had been worn to the point where I felt like I would let a judge hear it because I felt like I knew I was innocent and I didn't have nothing to do with it." (*Id.*) Plaintiffs allege, and Patrick has testified, that the police fed Patrick all the information that appears in his statement. (PSOF ¶ 30; Patrick Dep. 421.)

Defendants deny that Patrick was handcuffed to the wall in the room where Detectives Abreu and O'Connor questioned him. (Defs.' Resp. to PSOF ¶ 27.) They also deny that Patrick was refused an opportunity to speak with a lawyer, deny that Detective Abreu threatened Patrick or told him he would be sent to death row, and deny that anyone fed Patrick any information about the murders. (*Id.* at ¶¶ 28-29.) Detectives Abreu and O'Connor interviewed Patrick twice while Patrick was at Belmont and Western, and they claim they did not tell Patrick that his friends had implicated him in the murders until the second interview. (*Id.* at ¶ 29.) According to Abreu and O'Connor, as soon as Patrick learned about his friends' statements, he asserted "right away" that although he did shoot Lassiter, he did not kill Haugabook. (*Id.*) Defendants claim that State's Attorney Magats never entered Patrick's interview room with a court reporter, and that Detective Villardita's only contact with Patrick consisted of the detective's asking Patrick if he needed to use the bathroom or wanted anything to drink. (*Id.* ¶ 30.)

### f.     *Rodney Matthews*

Police arrested Rodney Matthews on December 3, 1992. (PSOF ¶ 31; Defs.' Resp. to PSOF ¶ 31.) Upon Matthews' arrival at Belmont and Western, he was placed in a lineup with Daniel Taylor, Deon Patrick, and others. (*Id.*) He was then taken to another room to wait. Two detectives eventually entered that room and asked Matthews about the Lassiter-Haugabook murders. (*Id.*) Matthews initially denied any knowledge of the murders, but at 1:00 a.m. on December 5—at least 25 hours after police took him into custody—Matthews signed a handwritten statement in which he implicated himself, Deon Patrick, and Daniel Taylor, among others, in the murders. (PSOF ¶ 32; Defs.' Resp. to PSOF ¶ 32.)

Plaintiffs contend, and Matthews has testified, that Matthews was handcuffed to a ring on the wall in his interview room and was unable to sit down while he was being interviewed. (PSOF ¶ 31; Matthews Dep. 81-83.) Handcuffed to the wall, Matthews urinated on himself because police would not release him to go to the bathroom. (Matthews Dep. 90-91.) He

eventually agreed to give a statement because his hands and wrists were swollen and painful from being cuffed to the wall. (*Id.* at 92-93.) The officers brought in a statement that was "already written up" and directed Matthews to practice reciting the details of that statement. (*Id.* at 94-95.) A state's attorney then entered the room but left when Matthews "couldn't get the story out" because Matthews "knew it wasn't true." (*Id.* at 95-96.) The officers proceeded to go over the details of the statement with Matthews approximately three more times. (*Id.* at 96.)

Defendants deny that Matthews was handcuffed to the wall and unable to sit down during his interviews with police. (Defs.' Resp. to PSOF ¶ 31.) They also deny that Matthews urinated on himself or that they rehearsed Matthews' statement with him multiple times. (*Id.* at ¶ 32.) They assert that Detectives Villardita and O'Connor interviewed Matthews twice, and that during the second interview he "confessed to his involvement in the murders." (*Id.*)

### g.     *Joseph Brown*

Police arrested Joseph Brown around 10:00 p.m. on December 3, 1992 and brought him to the facility at Belmont and Western. (PSOF ¶ 33; Defs.' Resp. to PSOF ¶ 33.) There, Villardita and another detective questioned Brown about the Lassiter-Haugabook murders, and Brown initially denied any knowledge. (*Id.*) At 3:50 a.m. on December 5, approximately 30 hours after police took him into custody, Brown gave a statement to Detective Johnson and a state's attorney. (*Id.* at ¶ 34.) In this statement, Brown admitted to attending the gang meeting at Clarendon Park where the murders were planned and to serving as a lookout at the corner of Hazel and Sunnyside for around five minutes before leaving. (*Id.* at ¶ 35.)

Plaintiffs contend that after Brown denied his involvement in the murders, detectives separately brought Paul Phillips, Lewis Gardner, and Dion Phillips to Brown's interrogation room, where each of them said "that's him." (PSOF ¶ 33; Brown Aff. ¶ 6, Ex. 26 to PSOF.) In a 2002 affidavit,[5] Brown stated that at one point while he was alone in the room he could hear

_____

[5]     Plaintiffs do not explain what led Brown to give an affidavit in 2002, but it appears that he may have done so in connection with Daniel Taylor's (unsuccessful) post-conviction

Rodney Matthews screaming and crying, and that when Detective Villardita returned he pointed a gun at Brown's head and said "I will kill you." (Brown Aff. ¶¶ 7-8.) After that, "detectives" refused to let Brown use the bathroom and then left Brown alone in the room for four or five hours. (*Id.* ¶ 9.) Later, detectives brought a piece of paper into the room and told Brown "you can sign a statement that says you were a lookout and it will not mean anything and you can go home." (*Id.*) The detectives then told Brown what to say and rehearsed a statement with him "many times." (*Id.* at ¶ 10.)

Defendants deny that anyone brought Paul Phillips, Dion Phillips, or Lewis Gardner to Brown's interview room. (Defs.' Resp. to PSOF ¶ 33.) They also deny that Villardita threatened Brown with a gun or that Brown was refused permission to use the bathroom (*Id.* at ¶ 34), though the evidence they cite to support this denial—certain passages from the depositions of Detectives Villardita and Johnson—does not specifically address Brown's assertions. (*Id.*) Rather, in one of those passages, Detective Johnson states that he and Villardita advised Brown of his *Miranda* rights and told Brown that others had implicated him in the murders, at which point Brown proceeded to admit his involvement. (Johnson Dep. 223.) The cited passages from Villardita's deposition do not discuss Brown at all. (Villardita Dep. 247-48, 437.)

## IV.   Doubts emerge about the confessions

Questions about the accuracy of these confessions emerged quickly. On December 3, police showed Faye McCoy a line-up consisting of Paul Phillips, Daniel Taylor, Rodney Matthews, Deon Patrick, and two other African-American males. (DSOF ¶ 33; PSOF ¶ 40.) During the lineup, Defendants Killacky and Delaney were inside the room with the lineup participants while Defendants Villardita and Johnson were outside the room with Faye McCoy. (*Id.*) McCoy observed the lineup participants through a glass window and said that she recognized most of them. (*Id.*; McCoy Dep. 59.) The parties dispute what else McCoy said. Plaintiffs assert, and McCoy has testified, that McCoy told Villardita and Johnson that although

petition for a writ of habeas corpus. *See U.S. ex rel. Taylor v. Briley*, No. 00 C 0625, 2002 WL 31844986 (N.D. Ill. Dec. 18, 2002).

she knew most of the men in the lineup they were not the people she had seen leaving Lassiter's building shortly after the murders. (PSOF ¶ 40; McCoy Dep. 59-61.) Indeed, McCoy says she told the police during the lineup that "they had the wrong people; go find Goldie." (McCoy Dep. 59.)

Defendants dispute Plaintiffs' account. (Defs.' Resp. to PSOF ¶ 40.) Villardita has testified that McCoy identified Taylor, Matthews, Phillips, and Patrick as people she had seen around the neighborhood, but then stated that she was afraid and would not testify in court. (Villardita Dep. 263-64.) Defendants Killacky and Delaney, who did not hear what McCoy said during the lineup but spoke with Villardita afterwards (Defs.' Resp. to PSOF ¶ 41), created a written report stating that McCoy "had seen [Taylor, Matthews, Phillips, and Patrick] in the area of 910 W. Agatite" and that "she is affraid [sic] and will not go to court." (Lineup Report 2, Ex. 33 to PSOF.) McCoy denies that she ever said she was afraid of going to court. (McCoy Dep. 60.)

Circumstances surrounding Daniel Taylor also raised doubts about the various confessions. According to these confessions, Taylor attended the gang meeting in Clarendon Park at 7:00 p.m. on November 16, 1992, and then accompanied Deon Patrick and others into Lassiter's apartment. At some point during the investigation, however—Plaintiffs say before Taylor confessed, while Defendants say shortly after—Taylor told Villardita and Johnson that he was "locked up" on the night of the murders. (DSOF ¶ 38; Pls.' Resp. to DSOF ¶ 39; Taylor Dep. 310-11; Villardita Dep. 256.) Johnson remembers thinking that Taylor's assertion was "kind of odd because we had his criminal history, and it didn't reflect any—any arrest for that date." (Johnson Dep. 237-38.)[6] Villardita says he was not concerned about Taylor's assertion when he first heard it, but that he and Johnson nevertheless decided, one or two days later, to contact someone named Caluris at the 23rd District police station to see if there were any arrest reports for Taylor from around the date of the murders. (Villardita Dep. 266-67.) On

---

[6]        It is not clear from Johnson's testimony exactly when he and Villardita first obtained or read Taylor's criminal history. Johnson testified that "[w]e certainly checked the criminal history," and that the version of that history "that we checked was dated the 2nd of December." (Johnson Dep. 238.)

December 6, Caluris told Villardita that there was, in fact, an arrest report for Daniel Taylor on November 16, showing that Taylor had been arrested at 6:45 p.m. for disorderly conduct. (DSOF ¶ 41.) Shortly after hearing this, Villardita and Johnson went to the 23rd District station and obtained copies of Taylor's November 16 arrest report and bond slip. (*Id.* at ¶ 42.) These documents showed that 23rd District Civilian Aide Larry Stinson "received" Taylor "into lockup" at 7:25 p.m. on November 16, and that Taylor remained in custody until 10:00 p.m. that night, when 23rd District Desk Officer James Gillespie signed his bond slip. (*Id.* at ¶ 43.)

Villardita and Johnson have testified that they informed their supervisors about Taylor's November 16 arrest report and bond slip, although neither remembers exactly when they did so or how their supervisors responded. (DSOF ¶ 47.) On December 7, Villardita and Johnson met with Assistant State's Attorneys David Styler and Garritt Howard and informed them about "the potential conflict" between the confessions police had obtained and the police records indicating that Taylor was in custody at the time of the murders. (*Id.* at ¶ 48.) Styler and Howard instructed Villardita and Johnson to further investigate "the Taylor lockup issue." (*Id.* at ¶ 50.) Styler himself agreed to interview police personnel who were on duty at the 23rd District on November 16. (*Id.* at ¶ 51.)

Villardita and Johnson created a "General Progress Report" (GPR) on their investigation, dated December 7-8, 1992. (GPR of Dec. 7-8, 1992, Ex. 36 to PSOF.) This GPR describes a conversation between the detectives and James Gillespie, the 23rd District desk officer who signed Taylor's bond slip. According to the GPR, Gillespie told the detectives that he had not, in fact, seen Taylor on November 16, although he did sign Taylor's bond slip that night. (*Id.* at 2.) The GPR also states "[Taylor] could have possibly been gone already when [Gillespie] signed the slip." (*Id.*) Defendants claim that this sentence reflects "what Villardita was thinking may have happened when he wrote this report," but they do not explain why Villardita believed that Gillespie signed a bond slip for a detainee he had not seen. (Defs.' Resp. to PSOF ¶ 42.) It appears that this was not standard procedure. Gillespie has testified that, although he does not

recall his conversation with Villardita and Johnson, he "wouldn't have said" that Taylor could have been released prior to Gillespie signing his bond slip because Gillespie "wouldn't [have been] given a bond with someone's signature on it and then fill it out." (Gillespie Dep. 103-04, Ex. 35 to PSOF.)

The GPR also describes an interview with a man named Adrian Grimes, a.k.a. "Pookie." According to the GPR, Grimes told police that he saw Daniel Taylor, Deon Patrick, Lewis Gardner, Paul Phillips, and Joseph Brown at or near Clarendon Park on the evening of November 16. Later, after he "saw people running s/b on Hazel and yelling about somebody being shot," Grimes allegedly "walked toward Agatite and observed Rock (Rodney Matthews) walking away from the sce [sic]." (GPR of Dec. 7-8, 1992, at 1-2.) Plaintiffs claim that Grimes' statement was "fabricated and coerced by Villardita, Johnson, and others." (PSOF ¶ 43.) Grimes has testified that police arrested him for "a drug case" on December 7, 1992, brought him to a "county jail," and "said that they will make this case go away" if Grimes agreed to testify against Taylor. (Grimes Dep. 43-47, Ex. 37 to PSOF.) Defendants deny this, but they admit that Grimes testified before a grand jury and at Taylor's trial, and was sentenced to a conditional discharge on his drug charge shortly thereafter. (Defs.' Resp. to PSOF ¶ 43.)

Villardita and Johnson subsequently drafted another General Progress Report (hereafter "timeline GPR"), in which they "chronologically documented Taylor's whereabouts on November 16." (*Id.* at ¶ 52.) They also obtained a copy of the "lockup log" that listed the names of people who were held in the 23rd District lockup on November 16 and 17, and then reviewed the arrest reports and bond slips for the people listed in that log. (*Id.* at ¶¶ 54-55.) Daniel Taylor's name appears in the lockup log immediately under the heading "3rd Watch-16 Nov 1992." (Lockup Log 1, Ex. 42 to PSOF.) The only other information associated with Taylor's entry in the log are the letters "D/C"—presumably indicating his disorderly conduct charge—and two numerical codes whose meaning is not clear from the record. (*Id.*)

Villardita and Johnson also asked two of the officers who were at Paul Phillips' apartment on November 16—Michael Berti and Sean Glinski, both Defendants here—to prepare a "supplemental report" on the incident that resulted in the arrest of Phillips' mother.  (PSOF ¶ 45; Defs.' Resp. to PSOF ¶ 45; Glinski Dep. 298-99, Ex. 38 to PSOF.)  The responding officers' earlier report, dated November 18, 1992 (and described above), said nothing about Daniel Taylor.  (*See* Police Report of Nov. 18, 1992.)  In their supplemental report, however, Berti and Glinski stated that when the officers left Phillips' apartment at 9:30 p.m. on November 16, they "observed Dan Taylor (Black T), who is known to [responding officers] from past encounters, walking WB, from the Clarendon Park area, on Agatite."  (Supplementary Report of Dec. 14, 1992, Ex. 41 to PSOF.)  According to this report, the officers asked Taylor if he knew where they could find Dion Phillips, and Taylor "agreed to show [responding officers] where he might be."  (*Id.*)

Plaintiffs contend that this supplemental report is "false" because Berti and Glinski's interaction with Taylor actually occurred after 10:00 p.m.  (PSOF ¶ 45.)  Defendants do not specifically address the timing issue, but they maintain that Berti and Glinski "reported truthfully and accurately" about their interactions with Taylor on November 16.  (Defs.' Resp. to PSOF ¶ 45.)  Glinski has testified that he and Berti did, in fact, interact with Taylor when they left Phillips' apartment that night.  (Glinski Dep. 92-96.)  According to Glinski, Taylor (who had been released from custody only minutes earlier) not only spoke with the officers, he "got in the car" and directed them to an apartment building a few blocks away, where he told them Dion stayed with his girlfriend.  (*Id.* at 95-96.)

## V.      Plaintiffs' prosecution and conviction

On December 29, 1992, the Cook County State's Attorney's Office obtained criminal indictments for Plaintiffs Gardner and Philllips, as well as for Deon Patrick, Daniel Taylor, Rodney Matthews, Dion Phillips, and Joseph Brown.  (PSOF ¶ 50.)  To obtain these indictments, the State's Attorney presented testimony from Detective O'Connor that recounted

information from the defendants' transcribed confessions. O'Connor testified, for example, that the police investigation into the Lassiter-Haugabook murders showed that all seven co-defendants attended a gang meeting in Clarendon Park on November 16, where they agreed to go to Jeffrey Lassiter's apartment to collect on a debt. They also agreed "that if [Lassiter] did not have the money, that the plan was to shoot him." Lewis Gardner, Paul Phillips, Dion Phillips, and Joseph Brown "were to act as lookouts around [Lassiter's] apartment building," O'Connor asserted. (O'Connor Grand Jury Testimony 4-5, Ex. 48 to PSOF.) Each of the seven co-defendants was charged with two counts of first degree murder, as well as home invasion, armed robbery, and conspiracy to commit armed robbery and first degree murder. (*Id.* at 3.) Both Plaintiffs here were detained pending trial. (PSOF ¶ 50.)

In early 1993, Assistant State's Attorney (ASA) Thomas Needham was assigned as the "first chair" prosecutor for all the co-defendants in the Lassiter-Haugabook murders. (DSOF ¶ 6; Needham Dep. 33-35, Ex. 2 to DSOF.) ASA Jeanne Bischoff acted as Needham's trial partner and second chair. (DSOF ¶ 6-7; Pls.' Resp. to DSOF ¶ 7.) Needham has testified that he learned "within minutes" of being assigned the cases that Taylor was claiming to have been in police custody at the time of the murders. (Needham Dep. 39-40.) Bischoff has testified that she, too, learned about Taylor's alibi "up front" and that she and Needham both "knew that that was an issue in the case. It was a big issue." (Bischoff Dep. 104, Ex. 3 to DSOF.)

At a status hearing on February 23, 1993, Needham tendered to all the co-defendants and their counsel "a full set of all the police reports and arrest slips and written statements and so forth" that were in Needham's possession at the time. (DSOF ¶ 76; Pls.' Resp. to DSOF ¶ 76.) These documents included, *inter alia*, Taylor's November 16 arrest report and bond slip, the police report on the lineup viewed by Faye McCoy, and the supplemental report by Officers Berti and Glinski, which described their interaction with Taylor on the night of November 16. Needham also tendered "at least two" general progress reports (GPRs) describing police officers' attempts to locate and interview a man named James Anderson, who shared a lockup

cell with Taylor on November 16. (DSOF ¶¶ 77-78, 91; Pls.' Resp. to DSOF ¶ 77-78, 91.) One of these GPRs stated that "ANDERSON was locked-up in 023 District with Black T (TAYLOR) one of the offenders charged." (GPR of Dec. 29, 1992, Ex. 21 to DSOF.) Plaintiffs acknowledge that they received these documents. (Pls.' Resp. to DSOF ¶ 77-78, 91.)

Plaintiffs contend, however, that the police withheld from the State's Attorney several additional documents relating to Taylor's alibi. According to Plaintiffs, police never turned over the timeline GPR, the lockup log, a roster of police personnel who were on duty at the 23rd District on November 16, or the arrest reports and bond slips of James Anderson and Eugene Fisher (who bonded out of the 23rd District lockup at the same time as Taylor). (PSOF ¶ 48.) Because police never turned over these documents to Needham, Plaintiffs argue, the state's attorney couldn't turn them over to Plaintiffs' criminal defense attorneys.

To support their contention that the police withheld these documents, Plaintiffs first cite an affidavit signed by Judge Andrew Berman of the Circuit Court of Cook County, who previously worked as a public defender and who represented Lewis Gardner in his criminal trial. Berman states in the affidavit that although he no longer has access to the file he compiled when he represented Lewis Gardner, he has "no recollection of ever seeing" the GPR timeline, the lockup log, the list of 23rd District personnel, or James Anderson's arrest report, among other documents relating to the Lassiter-Haugabook murder investigation. (Berman Aff. ¶¶ 4-5, Ex. 45 to PSOF.) He also states that he is "certain [he] never saw the documents relating to Daniel Taylor's incarceration at the time of the murders," and that he believes "those documents were never tendered to me during the discovery process." (*Id.* at ¶ 5.) Plaintiffs have not presented any evidence regarding what documents Paul Phillips and his defense counsel did or did not receive from the prosecutor.

Plaintiffs next cite a passage from ASA Needham's deposition, in which Needham testified that he does not recall ever seeing copies of either the lockup log or the list of personnel working at the 23rd District. (Needham Dep. 155-60, Ex. 34 to PSOF.) Needham

"think[s]" he would have turned over both of these documents to Plaintiffs' defense counsel if he had been in possession of them at the time Plaintiffs were prosecuted. (*Id.* at 156, 160.)

Defendants point out that Needham does not deny ever receiving a copy of the GPR timeline. (Defs.' Resp. to PSOF ¶ 48.) In fact, elsewhere in Needham's deposition he explicitly states that he did receive a copy of that document. (*Id.* 132-33, 172.) Detective Villardita, meanwhile, testified that he and Detective Johnson "made a package"[7] for the state's attorneys containing all the arrest reports of people who were in the 23rd District lockup on November 16. (Villardita Dep. 330-31.) Johnson testified that copies of the lockup log also "were taken down to the state's attorneys." (Johnson Dep. 307, 312.)

According to Plaintiffs, Defendants never revealed an additional piece of information: that officers located and interviewed James Anderson, and that Anderson confirmed that he was in custody with Daniel Taylor until 10:00 p.m. on November 16. (PSOF ¶ 49.) The parties agree that police never made a record of such an interview, but Defendants contend the interview never occurred in the first place. (*Id.*; Defs.' Resp. to PSOF ¶ 49.) Insisting that it did, Plaintiffs cite an affidavit Anderson signed in 2002, stating that "sometime after December 30, 1992, I was interviewed by two individuals I believed to be Chicago Police Department Detectives. Those individuals asked me if I had been in the lock up with a young black man on November 16, 1992. They said that they were investigating a case and were trying to figure out if the man was in jail at the time a crime they were investigating had occurred." (Aff. of James Anderson ¶ 7, Ex. 46 to PSOF.) Anderson further states that the officers showed him a picture of Taylor and that Anderson "told them that the person in the picture was the person I had been locked up with on November 16, 1992." (*Id.* at ¶ 8.) As noted, Defendants deny that this interview occurred. (Defs.' Resp. to PSOF ¶ 49.) Villardita and Johnson have both testified that although police searched for Anderson in hopes of conducting an interview, they were unable to locate him. (Villardita Dep. 337; Johnson Dep. 310-11.)

---

[7] This language is similar to that in one of Villardita and Johnson's GPRs, which states "[a]ttached is also a package for [ASA] Gary HOWARD." (GPR of Dec. 7-8, 1992.)

On March 1, 1993, police located and arrested Dennis Mixon, the man Faye McCoy had seen leaving the murder scene. (PSOF ¶ 36.) The next day, Mixon gave a confession to Detective Johnson and a state's attorney. In this confession, Mixon stated that he attended a gang meeting in Clarendon Park at approximately 7:00 p.m. on November 16, 1992, where Daniel Taylor, Rodney Matthews, and Deon Patrick planned to collect a debt from Jeffrey Lassiter. (*Id.* at ¶¶ 36-37; Defs.' Resp. to PSOF ¶¶ 36-37.) Mixon also stated that he was present in Jeffrey Lassiter's apartment when Deon Patrick shot both Lassiter and Haugabook. (*Id.*)

In March 1995, Plaintiffs' cases proceeded to bench trials before Judge Thomas A. Hett of the Circuit Court of Cook County. (*See* Exs. 53-54 to PSOF.) In a simultaneous proceeding against Deon Patrick, Judge Hett ruled that each co-defendant's confession was inadmissible as evidence against his co-defendants, but that if a defendant attempted to introduce evidence relating to the circumstances under which a co-defendant had confessed, the court would allow the prosecutor to introduce the entirety of that co-defendant's statement to the police, including the portions inculpating the defendant. (PSOF ¶ 57; Defs.' Resp. to PSOF ¶ 57.) In the end, the only confession introduced against either Gardner or Phillips was the one he himself had signed.[8]

Gardner, in consultation with his lawyer, decided to testify at his own trial. (DSOF ¶ 106; Pls.' Resp. to DSOF ¶ 106.) He repeated several assertions from the statement he gave to the police on December 3, 1992. Gardner testified, for example, that he had attended a gang meeting at Clarendon Park a couple of weeks before his arrest on December 2; that Deon Patrick, Rodney Matthews, and Dennis Mixon were at this meeting; that they discussed

_____

[8] Defendants assert that none of the various confessions were ever introduced at Plaintiffs' trials except for their own, though the evidence they cite for this assertion (a paragraph from Plaintiffs' Amended Complaint) does not support it. (DSOF ¶ 31.) Plaintiffs expressly deny Defendants' assertion in their response to Defendants' statement of material facts (*see* Pls.' Resp. to DSOF ¶ 32), but in Plaintiffs' brief opposing summary judgment they appear to concede the point. (*See* Pls.' Resp. in Opp. to Summ. J. (hereafter "Pls.' Resp. Br.") [120], at 22.)

collecting on a debt that was owed to them; and that the "guys on my case" told Gardner to act as a lookout on the corner of Agatite and Hazel. (DSOF ¶¶ 111-113.) Contrary to what he told police in his statement, however, Gardner testified at his trial that he abandoned his lookout post and was walking home when he heard gunfire. (*Id.* at ¶ 115.)

Gardner's claim that he had withdrawn from his lookout post became a core element of his lawyer's defense strategy after the court denied Gardner's motion to suppress his statement to the police. (Berman Dep. 97-98, Ex. 10 to DSOF; DSOF ¶ 99; PSOF ¶ 54.) Gardner and his lawyer were aware before the end of Gardner's trial that Daniel Taylor had told police that he was in custody at the time of the murders (DSOF ¶¶ 95, 100; Pls.' Resp. to DSOF ¶¶ 95, 100), but Gardner's lawyer concluded from the documents that had been produced to him by the prosecutor that Taylor's alibi was "highly improbable" and "so far out in left field that it wasn't worth getting into." (Berman Dep. 43-44.) At trial, neither Gardner nor the prosecutor introduced any evidence about Daniel Taylor's whereabouts on the night of the murders. (DSOF ¶ 116; Pls.' Resp. to DSOF ¶ 116.)

Judge Hett found both Gardner and Phillips—who unlike Gardner does not appear to have testified at his trial (*see* Phillips Trial Record 73, Ex. 54 to PSOF)—guilty of first-degree murder, home invasion, and armed robbery. (Phillips Trial Record 89; Gardner Trial Record S-39-S-40, Ex. 53 to PSOF.) In both cases, the judge relied in part on the statement that the defendant made to the police. (Gardner Trial Record S-38; Phillips Trial Record 86-90; PSOF ¶¶ 59-60.) At Gardner's trial, Judge Hett explained his finding by stating "I don't believe [Gardner's] testimony here in court . . . . I choose to believe the facts he gave in his statement [to the police]." (Gardner Trial Record S-35.) Deon Patrick, Daniel Taylor, and Dennis Mixon were also found guilty in separate jury trials—at least one of which (Deon Patrick's) was presided over by Judge Hett.[9] *See Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1039 (N.D.

---

[9] Judge Hett also presided over Joseph Brown's pre-trial proceedings and granted Brown's motion to suppress his statement to the police. Charges against Brown were dismissed. (Defs.' Resp. to PSOF ¶ 35; Report of Proceedings, Feb. 6, 1995, Ex. 25 to PSOF.)

Ill. 2016); *Taylor v. City of Chicago*, No. 14 C 737, 2015 WL 6561437, at *4 n.4 (N.D. Ill. Oct. 29, 2015).

In 2013, Dennis Mixon, then an inmate at the Menard Correctional Center in Menard, Illinois, signed an affidavit in which he recanted the portions of his 1993 confession that implicated Plaintiffs and the other five co-defendants. (Mixon Aff. ¶ 8, 10, Ex. 30 to PSOF.) In this affidavit, Mixon admits that he and three other men—whose names he declines to reveal, but who he says "did not look like teenagers"—entered Jeffrey Lassiter's apartment on November 16, 1992. (*Id.* at ¶¶ 3-4.) Mixon claims that he left the apartment when one of the other men pull out a gun, and that he heard gun shots after he left the apartment. (*Id.* at ¶ 4.) Mixon asserts that he "never attended a meeting in Clarendon Park." (*Id.* at ¶ 9.) When detectives interrogated him in 1993, Mixon says, he "was sick because [he] had swallowed drugs." (*Id.* at ¶ 13.) The detectives "put seven written statements from my eventual codefendants in front of me, and I went along with those statements." (*Id.* at ¶ 14.) Mixon claims that he "lied in saying that the other seven individuals had any part in the murders. They did not. The detectives gave me that information as well, and I went along with it." (*Id.* at ¶ 16.)[10]

Beyond Mixon's affidavit, the record in this case does not disclose the sequence of events that led the Circuit Court of Cook County, nearly two decades later, to vacate Plaintiffs' convictions and grant them certificates of innocence. It appears that both Gardner and Phillips were released on parole in 2007. *See* Steve Mills, *Ex-inmates Seek to Clear Names after Co-Defendants Exonerated*, CHI. TRIB. (Jan. 27, 2014), http://articles.chicagotribune.com/2014-01-

---

Charges against Dion Phillips were also dismissed before trial, though for reasons that are not disclosed in the record. Rodney Matthews was acquitted at trial. *See Taylor*, 2015 WL 6561437 at *4, n.4.

[10] Defendants "object" to Plaintiffs' characterization of Mixon's affidavit as "vague." (Defs.' Resp. to PSOF ¶ 38.) Plaintiffs claim that Mixon "admitted . . . that [his 1993 confession] was false." (PSOF ¶ 38.) Defendants have not specifically denied any of Mixon's assertions in the affidavit. (Defs.' Resp. to PSOF ¶ 38.)

27/news/ct-double-murder-petitions-met-20140128_1_deon-patrick-jeffrey-lassiter-sharon-haug

abook. Daniel Taylor remained in prison until 2013, when the Cook County State's Attorney's

Office reviewed his case and requested that his conviction be vacated. Steve Mills, *All Charges*

*Dropped against Man Convicted in Double Slaying*, CHI. TRIB. (June 28, 2013),

http://www.chicagotribune.com/news/local/breaking/chi-charges-dropped-against-daniel-taylor-

in-deaths-of-lassiter-and-haugabook-20130628-story.html. Deon Patrick's conviction was

similarly vacated in early 2014. Steve Mills, *Prosecutors Drop Conviction, Life Sentence in*

*1992 Chicago Murders*, CHI. TRIB. (Jan. 10, 2014), http://www.chicagotribune.com/news/local/

breaking/chi-prosecutors-drop-murder-conviction-and-life-sentence-in-contested-case-201401

10-story.html. Later that year, Judge Paul Biebel of the Circuit Court of Cook County granted

certificates of innocence to Gardner and Phillips. Steve Mills, *Men Granted Certificates of*

*Innocence in '92 Slayings*, CHI. TRIB. (Aug. 14, 2014), http://www.chicagotribune.com/

news/local/breaking/chi-men-granted-certificates-of-innocence-in-slayings-20140814-story.html.

These certificates state that both Gardner's and Phillips' "judgment or conviction was reversed

or vacated, and the indictment or information dismissed." (Gardner/Phillips Certificates of

Innocence, Exs. 103-04 to Plaintiff's Statement of Material Facts, Patrick v. City of Chicago, No.

14 C 3658 (N.D. Ill. Sept. 18, 2015), ECF No. 162.) They also state that Gardner and Phillips

are "innocent of the offenses charged in the indictment or information." (*Id.*)

## VI. Procedural Posture

Gardner and Phillips filed this case in November 2014.[11]  Their Amended Complaint,

filed November 24, 2014, included nine counts, six of them directed at officers Villardita,

Johnson, Killacky, O'Connor, Delaney, Heyrman, Glinski, and Berti, and three directed at the

City of Chicago. (*See* Am. Compl. [3], at ¶¶ 74-117.)  Defendants filed a motion to dismiss all of

Plaintiffs' claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which this court

---

[11]     Daniel Taylor and Deon Patrick are each pursuing similar claims before other
courts in this district. *See* Taylor v. City of Chicago, No. 14 C 737 (N.D. Ill. filed Feb. 3, 2014);
Patrick v. City of Chicago, No. 14 C 3658 (N.D. Ill. filed May 19, 2014).

granted in part as to Count VI of Plaintiffs' Amended Complaint (alleging intentional infliction of emotional distress) and as to one of the claims in Count II (alleging *Brady* violations premised on nondisclosure of allegedly coercive tactics used by police to obtain inculpatory statements from Plaintiffs and their co-defendants). *See Phillips v. City of Chi*, No. 14 C 9372, 2015 WL 5675529 (N.D. Ill. Sept. 24, 2015). The court otherwise denied Defendants' motion. *Id.*

The Defendant officers now move for partial summary judgment [110] on Plaintiffs' remaining claims in Count II (due process violations stemming from the alleged suppression of non-testimonial evidence and fabrication of inculpatory evidence) and Count V (malicious prosecution), as well as any remaining claims against the estate of the now-deceased Robert Heyrman. (*See* Defs.' Memo. of Law in Supp. of Partial Mot. for Summ. J. [111], at 1-2, 25-26.) The officers also ask the court to dismiss *all* of Plaintiff Gardner's claims—which, according to the officers, are premised on Gardner's admission that he perjured himself at his criminal trial— under the court's inherent power to punish those who abuse the judicial process. (*Id.* at 2-7.) The City of Chicago has moved for summary judgment [108] on any claims for which the court finds in the officers' favor, insofar as the city's liability under 42 U.S.C. § 1983, *respondeat superior*, and indemnification theories alike is premised on the existence of a viable claim against the individual officers.

## DISCUSSION

To prevail on a motion for summary judgment, the moving party must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The moving party's burden "may be discharged by 'showing' – that is, pointing out to the

district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

## I.    Gardner's alleged abuse of the judicial process

Defendants first ask the court to dismiss all of Plaintiff Gardner's claims pursuant to its inherent power to sanction abuse of the judicial process.  "A district court has inherent power to sanction a party who 'has willfully abused the judicial process or otherwise conducted litigation in bad faith.'"  *Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 401 (7th Cir. 2015) (quoting *Salmeron v. Enterprise Recovery Systems, Inc.*, 579 F.3d 787, 793 (7th Cir. 2009)).  "In general the severity of a sanction should be proportioned to the gravity of the offense."  *Allen v. Chicago Transit Authority*, 317 F.3d 696, 703 (7th Cir. 2003).  Although "[d]ismissal can be appropriate when the plaintiff has abused the judicial process by seeking relief based on information that the plaintiff knows is false," *Secrease*, 800 F.3d at 401, it is a "hefty sanction" that "should be used 'only when there is a record of delay [or] contumacious conduct.'"  *Greviskes v. Universities Research Ass'n, Inc.*, 417 F.3d 752, 759 (7th Cir. 2005).

As Defendants see things, Gardner is abusing the judicial process by seeking relief under "a theory premised on the express disavowal of his own prior sworn testimony."  (Defs.' Mot. for Summ. J. 2.).  Put differently, police officers who are alleged to have coerced Gardner into confessing to an offense for which he has since been exonerated are now asking the court to dismiss Gardner's claims against them because those claims logically require the conclusion that Gardner lied under oath at his 1995 criminal trial.   In Defendants' view, Gardner's inculpatory statements at his criminal trial were made voluntarily—and thus qualify as perjury— even if his original statement to the police was not.  The sanction of dismissal, they suggest, is therefore "necessary to protect the integrity of the judicial process."  (*Id.* at 4.)  Anything less would "erode the public's confidence in the outcome of judicial decision, call into question the legitimacy of courts, and threaten the entire judicial system."   (*Id.* at 6 (quoting *Rhodes v. LaSalle Bank, N.A.*, No. 02 C 2059, 2005 WL 281221, at *3 (N.D. Ill. Feb. 1, 2005) (Manning, J.)

(dismissing claims of plaintiff who stole proprietary documents from defendant for the purpose of using them in litigation, and then lied about those documents in her deposition).)

Defendants suggest that the Seventh Circuit's decision in *Dye v. Wargo*, 253 F.3d 296, 298 (7th Cir. 2001), is "essentially dispositive of this case." (Defs.' Mot. for Summ. J. 4) Anthony Dye pleaded guilty in state court to attempted battery with a deadly weapon and possession of a handgun by a convicted felon, among other offenses. As part of his plea, Dye admitted that he had fired a weapon at a police officer (who then returned fire and directed a police dog to bite Dye's legs), and that he had initially fled from the officer because he knew he was not supposed to be carrying the weapon. *Id.* at 298. In his subsequent lawsuit seeking damages for injuries he sustained during the incident, Dye alleged that he fired his weapon at the dog in self-defense and ran from the officer because "he feared violence at the hands of the police." *Id.* at 298. The District Court granted summary judgment and the Seventh Circuit affirmed, holding that the language in Dye's plea agreement barred his federal case. *Id.* at 297-302. In its opinion, the majority noted the inconsistencies between Dye's accounts of the underlying incident in state and federal court. "One or the other of Dye's stories is perjury," they explained, and Dye's contention in federal court—that he "was entitled to lie in state court to ensure that the judge accepted the favorable plea bargain"—"is not a position that any judicial system can, or does, tolerate." *Id.* at 298.

The *Dye* majority's passing remarks about what "any" judicial system "can, or does, tolerate" is not, as Defendants contend, "dispositive" of the issue now before this court. (Defs.' Mot. for Summ. J. 4).[12] The decision in *Dye* to affirm summary judgment for the defendants was

---

[12] The Seventh Circuit's decision in *Escamilla v. Jungwirth*, 426 F.3d 868 (7th Cir. 2005), *abrogated on other grounds by McQuiggin v. Perkins*, 569 U.S. 383 (2013), may actually be a better case for Defendants than *Dye* in this regard, although it too rested its dismissal of the plaintiff's federal claims on grounds other than the plaintiff's inconsistent prior state-court testimony (this alternative basis for dismissal—the supposed untimeliness of the plaintiffs' federal claims—was later abrogated by the U.S. Supreme Court). *Escamilla* involved a collateral attack on a state-court conviction under 28 U.S.C. § 2254. At the plaintiff's criminal trial, he testified, consistently with what he had previously told police, that he drove the car from which fellow gang members "debarked to commit [a] murder." *Escamilla*, 426 F.3d at 869. The

not premised on the inconsistencies between the plaintiff's testimony in state and federal court. And Defendants' assertion that *Dye* not only permits but actually *requires* district courts to dismiss federal claims that are inconsistent with the plaintiff's prior testimony in state court cannot be squared with other Seventh Circuit authority. In *Allen v. Chicago Transit Authority*, for example, the Seventh Circuit concluded that the general principle that "perjury should estop a litigant to continue litigating the claim out of which the perjury arose" would be "untenable if stated as a rule rather than an option." 317 F.3d at 703. Although "perjury is a serious offense," the court explained, "one can imagine cases in which a sanction of dismissal would be excessive"—such as where "the opposing litigant had perjured himself as well," or where "the perjury was clumsily committed and quickly discovered." *Id.* In several other cases, meanwhile, the Seventh Circuit has advised that "[t]he inherent authority to dismiss should be used 'only when there is a record of delay [or] contumacious conduct," and that "[i]n deciding what measure of sanctions to impose, the district court should consider 'the egregiousness of the conduct in question in relation to all aspects of the judicial process.'" *Greviskes*, 417 F.3d at 759 (quoting *Dotson v. Bravo*, 321 F.3d 663, 667 (7th Cir. 2003)). *See also Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 2000) ("This ultimate sanction [i.e., dismissal] is reserved for cases in which the offending party has demonstrated wilfulness [sic], bad faith, or fault."); *Webber v. Eye Corp.*, 721 F.2d 1067, 1068-70 (7th Cir. 1983) ("A dismissal with prejudice is a harsh

plaintiff unsuccessfully attempted to persuade the jury that he had believed the purpose of the trip was to "pick up one passenger's girlfriend rather than to kill anyone." *Id.* at 869. In his collateral attack on his conviction, however, the plaintiff asserted that "*he* was the perjurer at trial—that he was nowhere near the scene of the murder, and that his pretrial statement [was] the product of coercive interrogation." *Id.* at 870 (emphasis in original). The Seventh Circuit found it "difficult to see how a collateral attack based on the proposition that the petitioner's own trial testimony was a pack of lies has any prospect of success. Litigants must live with the stories that they tell under oath." *Id.* Nor was the court persuaded by the plaintiff's argument that he had "no choice" but to testify consistently with what he had told police because his criminal defense attorney (whom he now alleged provided him with ineffective assistance of counsel) withdrew a motion to suppress his statement to the police. *Id.* According to the Court of Appeals, the plaintiff "could have asked the [trial] court for a new lawyer, remained silent at trial, or testified to what he now insists is the truth and asked the jury to disregard what he had said before. The legal system offers many ways to deal with problems; perjury is not among them." *Id.*

sanction which should usually be employed only in extreme situations, when there is a clear record of delay or contumacious conduct, or when other less drastic sanctions have proven unavailing.").

It is true, as Defendants point out, that numerous courts have concluded that a party's lies in court were sufficiently egregious to warrant either dismissal of his or her claims or a default judgment for the other party. But the conduct in each of these cases is distinguishable from Lewis Gardner's. In *Allen*, for example, one of the plaintiffs committed perjury in a deposition and then refused to pay a fine ordered by the court as a sanction. 317 F.3d at 702. The conduct that warranted dismissal, according to the Court of Appeals, was the "willful failure to pay fees due in the trial court or fines or other monetary sanctions imposed by that court." *Id.* *Dotson v. Bravo*, meanwhile, involved a plaintiff who had engaged in a pattern of "deliberate *ongoing* concealment of his true identity" from law enforcement and state and federal courts alike. 202 F.R.D. 559, 564 (N.D. Ill. 2001) (emphasis added), *aff'd*, 321 F.3d 663 (7th Cir. 2003). And in *Quela v. Payco-Gen. Am. Creditas, Inc.*, the court entered a default judgment against a defendant whose employees "intentionally coerced" their subordinates into giving "fraudulent written statements and false deposition testimony." No. 99 C 1904, 2000 WL 656681, at *5 (N.D. Ill. May 18, 2000).

Unlike the sanctioned parties in these cases, Lewis Gardner has not coerced others into giving false testimony, refused to pay court-ordered fines, or engaged in an "ongoing" pattern of deception. Nor, to the court's knowledge, has Gardner concealed, destroyed, or forged documents and then lied to the court about doing so, as the plaintiffs did in the other cases Defendants cite. *See Secrease*, 800 F.3d at 399; *Jackson v. Murphy*, 468 Fed. App'x 616, 620 (7th Cir. 2012); *Thomas v. Gen. Motors Acceptance Corp.*, 288 F.3d 305 (7th Cir. 2002); *Ridge Chrysler Jeep, LLC v. Daimler Chrysler Servs. N. Am., LLC*, No. 03 C 760, 2006 WL 2808158 (N.D. Ill. Sept. 6, 2006), *aff'd sub nom. Ridge Chrysler Jeep, LLC v. DaimlerChrysler Fin. Servs. Americas LLC*, 516 F.3d 623 (7th Cir. 2008); *Rhodes v. LaSalle Bank, N.A.*, No. 02 C 2059,

2005 WL 281221 (N.D. Ill. Feb. 1, 2005); *Brady v. United States*, 877 F. Supp. 444 (C.D. Ill. 1994). Rather, Gardner testified falsely in a single state-court proceeding more than twenty years ago. He claims in this case that he did so only because he had to explain a substantially similar coerced confession, which the prosecutor would have introduced into evidence regardless of whether Gardner testified. Unlike the falsehoods and forgeries at issue in most of the cases cited by Defendants, Gardner's testimony was not part of an elaborate scheme to deceive the court or to obtain a benefit from litigation. Notably, a significant portion of the allegedly false testimony consisted of Gardner *inculpating himself in a double murder*. It appears that Gardner testified for the purpose of establishing a "withdrawal" defense, an apparently isolated miscalculation by a teenager who found himself in an unimaginably difficult situation.[13]

Allowing Gardner to proceed will not "threaten the entire judicial system" by inviting further perjury. *Rhodes*, 2005 WL 281221, at *3. Given the unusual circumstances of this case (and the unusual character of the false statements in question), the court does not see how dismissal would serve a deterrent function. The small number of criminal defendants who find themselves in circumstances sufficiently similar to Gardner's are not likely to follow his example, as the risks involved in falsely inculpating themselves vastly outweigh the remote possibility of obtaining monetary relief for constitutional violations in hypothetical future proceedings. In short, the court sees no pressing need to deter criminal defendants from falsely confessing in court to murder, which they already have ample incentive to avoid. The court therefore declines Defendants' invitation to dismiss Gardner's claims pursuant to its inherent power to sanction abuse of the judicial process.

---

[13]     The doctrine of judicial estoppel bars a litigant from taking an inconsistent position in litigation, but only if he prevails on the initial position. *See Moriarty v. Svec*, 233 F.3d 955, 962 (7th Cir. 2000). Gardner did not prevail on his withdrawal defense, and thus is not barred by judicial estoppel from subsequently abandoning that strategy.

## II.    Due Process (Count II)

Defendants next move for summary judgment on Plaintiffs' due process claims that survived Defendants' earlier motion to dismiss.  *See Phillips v. City of Chicago*, No 14 C 9372, 2015 WL 5675529, at *4-5, 8 (N.D. Ill. Sept. 24, 2015).  These claims allege that Defendants both withheld exculpatory evidence and fabricated inculpatory evidence.

### a.    Withholding of exculpatory evidence

In *Brady v. Maryland*, the U.S. Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. 83, 87 (1963).  The Court has since expanded this disclosure obligation to include impeachment evidence as well as exculpatory evidence.  *See, e.g.*, *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006).  Police can be liable for *Brady* violations if they fail to disclose such evidence to prosecutors.  *Beaman v. Freesmeyer*, 776 F.3d 500, 512 (7th Cir. 2015).  A so-called *Brady* claim includes "three basic elements," regardless of the official at whom it is directed: "(1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued— in other words, 'materiality.'"  *Carvajal v. Dominguez*, 542 F.3d 561, 566-67 (7th Cir. 2008).

In this case, Plaintiffs claim that the Defendant-officers committed *Brady* violations by failing to disclose the following evidence: (1) the "timeline GPR" authored by Detectives Villardita and Johnson, which traced Daniel Taylor's whereabouts on the night of November 16, 1992; (2) the "lockup log," which listed the names of individuals who were in the 23rd District lockup on November 16 and 17; (3) a roster of police personnel who were on duty at the 23rd District on November 16; (4) the bond slips of James Anderson and Eugene Fisher, who allegedly "bonded out" of the 23rd District lockup at the same time as Taylor; and (5) all information regarding the alleged police interview of James Anderson, in which Anderson

allegedly confirmed that he shared a cell with Taylor on the night of November 16. (Pls.' Resp. Br. 16.)[14]

Defendants first argue that the first four documents listed above cannot support a *Brady* claim because police turned them over to the state's attorney. "Usually," the Seventh Circuit has explained, "a police officer's *Brady* obligations are discharged by disclosing material exculpatory evidence to the prosecutor, for it is the prosecutor's responsibility to turn the evidence over to defense counsel." *Beaman v. Freesmeyer*, 776 F.3d 500, 512 (7th Cir. 2015). Whether the police did, in fact, turn over these documents is disputed. Defendants contend that they turned over the timeline GPR to Needham, and that Plaintiffs received copies it from Needham. (Defs.' Resp. to PSOF ¶ 48.) Needham testified that he received a copy of the timeline GPR from police, but he does not remember if he provided it to Plaintiffs or their co-defendants. (Needham Dep. 132-33, 172.) Lewis Gardner's criminal defense attorney, Andrew Berman, insists that he never received "the documents relating to Daniel Taylor's incarceration at the time of the murders," including the timeline GPR. (Berman Aff. ¶ 5.)

It is possible, of course, that the police turned over the timeline GPR to the prosecutor and the prosecutor then withheld the document from Berman. A reasonable jury could conclude as much from the evidence presented here. But Plaintiffs need not prove beyond a reasonable doubt that the police withheld the timeline GPR from the prosecutor. ASA Needham did turn over some evidence of Taylor's whereabouts on November 16, such as Taylor's bond slip, to Plaintiffs' criminal defense counsel. A jury could believe that Berman never received the timeline GPR and doubt that Needham would have withheld some, but not all, of the evidence in his possession that related to Taylor's alibi. The jury could then reasonably infer that Needham never actually received a copy of the timeline GPR from the police, or that he didn't receive it

---

[14] Plaintiffs originally claimed that Defendants committed a *Brady* violation by failing to disclose what Faye McCoy allegedly told Villardita and Johnson on December 3, 1992, when she viewed a lineup that included Paul Phillips and various codefendants. In their response brief, however, Plaintiffs have withdrawn this claim (Pls.' Resp. Br. 15 n.3), and the court does not consider it here.

until a later date. The reasonableness of this inference means that there is a genuine dispute as to whether police turned over the timeline GPR to the state's attorney's office.

So too for the lockup log, the 23rd District personnel roster, the alleged police interview with James Anderson, and the bond slips of Anderson and Eugene Fisher. Detective Johnson testified that copies of the lockup log "were taken down to the state's attorneys." (Johnson Dep. 307, 312.) But ASA Needham does not recall seeing copies of that document or the personnel roster, and Plaintiffs claim that they never received either document. (Needham Dep. 155-60, Ex. 34 to PSOF; PSOF ¶ 48.) Needham "think[s]" he would have turned over both of these documents to Plaintiffs' defense counsel if he had been in possession of them at the time Plaintiffs were prosecuted. (Needham Dep. 156, 160.) This is sufficient to create a genuine dispute of fact as to whether Defendants gave the lockup log or the personnel roster to the state's attorney. With regard to the alleged police interview of James Anderson, Defendants deny that any such interview ever occurred. But James Anderson has testified that it did, and that he told officers that he shared a cell with Daniel Taylor on November 16. (Anderson Aff. ¶ 7.) This creates a genuine dispute as to whether the interview occurred, and thus whether Defendants withheld information about the interview. Finally, there is evidence in the record that Plaintiffs' criminal defense counsel never received the bond slips of James Anderson and Eugene Fisher.[15] A reasonable jury could infer that police never turned over these bond slips to the state's attorney.

These genuine disputes do not end the court's analysis, however. To preclude summary judgment for Defendants, the genuinely disputed facts must be material to Plaintiffs' *Brady* claim. If Plaintiffs were not actually prejudiced by their lack of access to the allegedly withheld

---

[15] Defendants move to strike this evidence, which consists of an affidavit from Plaintiffs' attorney in this case, John Stainthorp. Stainthorp asserts that he examined Andrew Berman's file on Lewis Gardner, and that the two bond slips were not in that file. (*See* Aff. of John Stainthorp ¶ 8, Ex. 31 to PSOF.) Mr. Stainthorp's statements about the contents of the file he reviewed are based on his personal observation, and Defendants have not demonstrated that they were prejudiced by Plaintiffs' failure to disclose Stainthorp as a witness. The motion to strike is denied.

evidence—either because the evidence was not favorable to Plaintiffs or because Plaintiffs were already aware of the evidence—these disputes will not preclude summary judgment for Defendants on this aspect of their motion. In considering whether withheld evidence was favorable and whether its withholding resulted in prejudice, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Bielanski v. County of Kane*, 550 F.3d 632, 644 (7th Cir. 2008) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

Defendants argue that none of the allegedly withheld evidence is favorable to Plaintiffs, as it is only exculpatory with regard to Taylor. (*See* Defs.' Mot. for Summ. J. 17; Defs.' Reply [133], at 10-11.) They analogize Plaintiffs' case to *Harris v. Kuba*, 486 F.3d 1010 (7th Cir. 2007), which involved a plaintiff (Keith Harris) who had been convicted of armed robbery and attempted murder in 1979 based on a victim's identification of him as the person who robbed and shot an employee of a gas station in Caseyville, Illinois. Ballistics testing linked the Caseyville incident to two other crimes in the area. *Id.* at 1013. Harris was never charged with those crimes, however, as other suspects confessed to them, and Harris's employer told police that Harris was at work when they occurred. *Id.* The other suspects later confessed to the Caseyville incident as well, and in 2003 Harris was pardoned as innocent. *Id.* at 1011-13. He then sued the police officers who investigated the Caseyville incident, claiming, *inter alia*, that although the officers did turn over the ballistics report linking the Caseyville shooting to the two other crimes, the officers nevertheless committed *Brady* violations by failing to turn over the information they had obtained about Harris's alibi for, and the other suspects' confessions to, those other crimes. *Id.* at 1013. The Seventh Circuit affirmed summary judgment for the officers, concluding that neither Harris's alibi for the other crimes, nor the other suspects' confessions to those crimes, were "relevant" to the shooting for which Harris was charged. *Id.* at 1016. Evidence linking that shooting to other crimes was "arguably favorable only after

several inferences are made." *Id.* These inferences "stretch[] the meaning of 'favorable' beyond that of *Brady*," the court explained. "[I]t is not the responsibility of the police or prosecutors to craft a defense theory." *Id.*

*Harris* is superficially analogous but distinguishable. In this case, evidence of Daniel Taylor's alibi casts doubt on the accuracy of Plaintiffs' own statements to the police, both of which placed Taylor at the gang meeting in Clarendon Park and inside Lassiter's building at the time of the murders. Unlike in *Harris*, where the withheld evidence related to crimes other than the one for which the plaintiff was charged, evidence of Taylor's whereabouts on November 16 relates to the very crime for which Phillips and Gardner were charged and convicted. In *Harris*, "several inferences" were required before the withheld evidence could plausibly be viewed as favorable to the plaintiff. Only one inference is required here: because an important fact in Plaintiffs' statements to the police appears to be untrue, other parts of these statements—including those that inculpate Plaintiffs—may be untrue as well. Because evidence supporting Taylor's alibi impeaches the credibility of the primary evidence that supported Plaintiffs' convictions (that is, their own statements to the police), it qualifies as "favorable" for purposes of a *Brady* claim.

Defendants next argue that Plaintiffs were not prejudiced by the withholding of any of the evidence relating to Taylor's alibi because Plaintiffs didn't actually pursue a defense theory premised on the argument that "Taylor did not do it, so I did not do it." (Defs.' Mot. for Summ. J. 17.) Defendants do not cite any case law for their contention that favorable evidence is immaterial unless it supports the specific defenses a criminal defendant raised at trial, and this court rejects it. Such an argument would effectively insulate law-enforcement defendants from *Brady* liability in cases where they are most culpable—that is, where officers withhold *all* evidence supporting a particular defense theory and thereby prevent a criminal defendant from ever becoming aware of that theory.

Defendants are on firmer ground, however, when they argue that Plaintiffs do not have a viable *Brady* claim because they and their defense attorneys already knew about Taylor's alibi at the time of their criminal trials, or else reasonably could have become aware of it from the evidence they had.  (Defs.' Resp. Br. 11-12.)  Another court in this district has already granted summary judgment for Defendants on Deon Patrick's *Brady* claim—which alleged that Defendants withheld some of the same evidence that is at issue in this case—because Patrick's attorney testified that he was aware of the Taylor lockup issue at the time of Patrick's criminal trial.  *See Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1051-53 (N.D. Ill. 2016) (Guzman, J.).  The Seventh Circuit has stated that "evidence is not 'suppressed' if the defendant knew of the evidence and could have obtained it through the exercise of reasonable diligence."  *United States v. Walker*, 746 F.3d 300, 306 (7th Cir. 2014).  It has also suggested that there may be insufficient prejudice to support a *Brady* claim where the defense "was already aware" of the issue to which the withheld evidence relates and had a "full opportunity" to raise that issue at trial.  *Pruitt v. McAdory*, 337 F.3d 921, 926-27 (7th Cir. 2003); *cf. United States v. Fallon*, 348 F.3d 248, 252 (7th Cir. 2003) (insufficient prejudice for *Brady* claim where withheld evidence "was merely cumulative of an extensive amount of other evidence").

It is undisputed that "[b]efore the end of Gardner's criminal trial," his attorney "was aware of the Taylor lock-up issue."  (DSOF ¶ 95; Pls.' Resp. to DSOF ¶ 95.)  Plaintiffs emphasize, however, that their defense attorneys were not aware of the *specific* evidence that Plaintiffs claim the police withheld from the prosecutor.  They argue that it is "absurd" to assume that their criminal defense attorneys could have "intuit[ed] that there was substantial additional evidence that corroborated" their limited knowledge of Taylor's alibi.  (Pls.' Resp. Br. 17.)  The evidence regarding Taylor that they did receive was, in Plaintiffs' words, "inexact as to its importance," as well as "diminished" in value by the Berti and Glinski supplemental report (which suggested that Taylor had been released earlier than his bond slip indicated).  (*Id.*)  Thus, Plaintiffs maintain,

the withheld evidence was "critical" and would have provided independent verification of what otherwise "might be written off as clerical error." (*Id. at* 16.)

The court is not persuaded by Plaintiffs' argument. It is undisputed that both Plaintiffs were provided with Taylor's arrest report and bond slip, which together indicated that Taylor was in police custody from 6:45 p.m. until 10:00 p.m. on November 16, 1992. (DSOF ¶ 77; Pls.' Resp. to DSOF ¶ 77; Ex. 20 to PSOF; Ex. 13 to DSOF.) It is also undisputed that Plaintiffs were provided with a GPR that identified James Anderson as a person who "was locked-up in 023 District with Black T (TAYLOR) one of the offenders charged." (GPR of Dec. 29, 1992, Ex. 21 to DSOF.) The latter document does not specify *when* Anderson was in custody with Taylor, or that Anderson was Taylor's cellmate, but when viewed alongside Taylor's arrest report and bond slip, the GPR clearly "put plaintiff[s] on notice that [Anderson] had exculpatory information." *Logan v. City of Chicago*, 891 F. Supp. 2d 897, 902-03 (N.D. Ill. 2012). This case therefore is not analogous to *Boss v. Pierce*, where the Seventh Circuit concluded that a prosecutor committed a *Brady* violation by withholding evidence of exculpatory statements that the defendant's own alibi witness made to investigators. 263 F.3d 734 (7th Cir. 2001). The plaintiff's criminal defense lawyer couldn't have discovered the witness's statements through "reasonable diligence," the court explained, because the statements concerned "matters completely unrelated to the witness's role in the case." *Id.* at 741. James Anderson's alleged statements to the police, by contrast, concern precisely the subject matter addressed in the evidence Plaintiffs had in their possession—that is, Anderson's imprisonment with Daniel Taylor at the 23rd District lockup. In circumstances like these, where a criminal defendant was on notice of the type of information that a witness might possess, the Seventh Circuit has made it clear that it is a criminal defendant's "responsibility to probe the witnesses and investigate their versions of the relevant events." *Carvajal*, 542 F.3d at 567.

The timeline GPR is largely cumulative. It states that Taylor was "received in lock-up by L. Stinson" at "1925 Hrs." and was "Bonded by P.O. Gillespie" at "2200 Hrs.," but it cites, as the

source of this information, Taylor's arrest report and bond slip—documents in Plaintiffs' possession at the time of their criminal trials. The timeline GPR would not have provided "independent" verification of those documents' accuracy because it simply repeats information contained in those documents and cites them as the source of the information.

The court concludes that none of the other, non-cumulative information in the timeline GPR, lockup log, bond slips, and personnel roster was so "critical" to a defense premised on Taylor's alibi that withholding them casts doubt on the fairness of Plaintiffs' criminal trials. Officer Gillespie's statement that he didn't recall seeing Taylor on November 16 isn't even favorable to Plaintiffs. And the names of 23rd District personnel and of persons who were locked up there on November 16 could have been obtained with reasonable diligence. Plaintiffs' lawyers could have interviewed Gillespie and Stinson, whose identities were disclosed on Taylor's arrest report and bond slip. As with the Anderson's alleged statements to police, Plaintiffs were on notice that officers at the 23rd District and persons in the 23rd District lockup might have information about Taylor's whereabouts on the night of November 16, 1992. The court therefore grants Defendants' motion for summary judgment on Plaintiffs' claims that Defendants deprived them of due process by withholding exculpatory evidence from the prosecutor.

### b.      Reconsideration of previously dismissed *Brady* claims

This court previously dismissed Plaintiffs' claims that Defendants committed *Brady* violations by failing to disclose the tactics they used to obtain Plaintiffs' and their co-defendants' confessions. *See Phillips*, 2015 WL 5675529 at *5. Because Plaintiffs were aware of the tactics police used to obtain Plaintiffs' own confessions, the court explained, the alleged nondisclosure of those tactics cannot support a *Brady* claim. *Id.* (citing *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006)). The court also held that Plaintiffs cannot rest their *Brady* claim on the alleged nondisclosure of the tactics police used to obtain statements from Plaintiffs' co-defendants. "[P]olice officers' nondisclosure of coercive acts used to obtain incriminating

evidence from people other than the plaintiff sounds in malicious prosecution rather than due process," the court concluded, "since the officers' coercive conduct 'may have violated the witness's rights, but it did not violate the arrestee's due process rights.'" *Id.* (citing *Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014)). Plaintiffs now argue that this latter portion of the court's ruling—that Plaintiffs have no viable *Brady* claim premised on the nondisclosure of the tactics used to obtain their co-defendants' statements—"must be reconsidered in light of the subsequent decision" in *Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir.), *cert. denied sub nom. Hernandez v. Avery*, 137 S. Ct. 2249 (2017). (Pls.' Resp. Br. 21.)[16]

The plaintiff in *Avery* served six years in prison for murder before being exonerated by DNA evidence. 847 F.3d at 437. At the plaintiff's criminal trial, two Milwaukee police detectives testified that he confessed to the murder during his interrogation. *Id.* The prosecutor also introduced police reports documenting statements by three witnesses, each of whom told police that they heard the plaintiff admit to strangling a woman to death. *Id.* at 436-37. After the plaintiff was released from prison, he sued the detectives and the City of Milwaukee in federal court, arguing that the detectives committed *Brady* violations by withholding evidence that they coerced the three witnesses into giving their statements. *Id.* The plaintiff also argued that he never confessed to the murder during his interrogation, and that the detectives deprived him of due process by fabricating a police report suggesting that he did. *Id.* The district court granted summary judgment for the officers on the plaintiff's *Brady* claims, finding that the police had no obligation to disclose impeachment evidence relating to the witnesses' statements about what the plaintiff told them, because the plaintiff "knew what he said (or didn't say)" to those witnesses. *Id.* at 434, 437. The court also set aside a jury verdict for the plaintiff on his evidence-fabrication claim, reasoning that "an evidence-fabrication claim 'sounds' in malicious prosecution," rather than due process, and state law provided the plaintiff with a remedy for the

---

[16] Plaintiffs do not ask the court to reconsider its conclusion that Plaintiffs cannot rest their *Brady* claims on the non-disclosure of the tactics police used to obtain Plaintiffs' own confessions. (Pls.' Resp. Br. 21 n.5.)

tort of malicious prosecution. *Id.* at 438. The Seventh Circuit reversed both holdings. The "material question" about the plaintiff's *Brady* claim was not whether he knew that the witnesses' statements were false, the Court of Appeals explained, but rather whether he knew of evidence that could be used to impeach the credibility of those statements. *Id.* at 443. "The availability of a state-law remedy for malicious prosecution," moreover, "doesn't defeat a federal due-process claim against an officer who fabricates evidence that is later used to obtain a wrongful conviction." *Id.* at 441.

Plaintiffs are correct that *Avery* calls into question this court's previous assertion that a claim for the coercion of third parties necessarily "sounds in malicious prosecution rather than due process." *Phillips*, 2015 WL 5675529 at *5. But *Avery* does not breathe life into Plaintiffs' *Brady* claims. *Avery* shows that the nondisclosure of evidence relating to the coercion of third parties deprives a criminal defendant of due process *where that nondisclosure prejudicially deprives the criminal defendant of favorable impeachment evidence.* *Avery*, 847 F.3d at 443 ("The detectives . . . failed to disclose material impeachment evidence regarding their interrogations of the three [witnesses], and their suppression of this evidence prejudiced Avery's defense.") In this case, unlike in *Avery*, none of Plaintiffs' co-defendants' statements were introduced at Plaintiffs' criminal trials. *Id.* at 437. It is difficult to see how the fairness of these trials was compromised by Plaintiffs' inability to impeach the credibility of evidence that was not introduced. Thus, Plaintiffs' motion to reconsider is denied.

### c.    Fabrication of evidence

Plaintiffs may proceed, however, with their claims that Defendants deprived them of due process by fabricating evidence. In the Seventh Circuit, "a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012). Plaintiffs allege that Defendants "fabricated" the following evidence: (1) their own statements to the police; (2) their codefendants' statements to the police; (3) the police

report by Officers Killacky and Delaney, which suggested that Faye McCoy was afraid of Paul Phillips (among others) and therefore would not testify in court; and (4) the supplemental police report by Officers Berti and Glinski, which suggested that Daniel Taylor had been released earlier on November 16 than his bond slip indicated. (Pls.' Resp. Br. 21.)

Defendants contend that Plaintiffs' evidence fabrication claims must be limited to evidence that was introduced in their individual criminal trials. Evidence that was not introduced at Plaintiffs' trials, Defendants reason, cannot have been the legal cause of Plaintiffs' conviction and imprisonment. (Defs.' Mot. for Summ. J. 19.)

It is true that Plaintiffs have no due process claim if Defendants' alleged fabrication of evidence did not proximately cause a deprivation of Plaintiffs' liberty. "[I]f an officer (or investigating prosecutor) fabricates evidence and then puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest." *Bianchi v. McQueen*, 818 F.3d 309, 320 (7th Cir. 2016) (quoting *Whitlock*, 682 F.3d at 582). It is not clear, however, that fabricated evidence not introduced at trial can *never* be the proximate cause of a wrongful conviction. *Compare Whitlock*, 682 F.3d at 582 (alleged constitutional violation "was not complete" until prosecutor introduced fabricated evidence at plaintiff's criminal trial); *Avery*, 847 F.3d at 440-43 ("A § 1983 claim requires a constitutional violation, and the due-process violation wasn't complete until the false confession was introduced at [the plaintiff's] trial, resulting in his conviction and imprisonment for a murder he did not commit."), *with Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014) ("[T]he fabrication of evidence harmed the defendant before and not just during the trial, because it was used to help indict him."); *Collier v. City of Chicago*, No. 14 C 2157, 2015 WL 5081408, at *7 (N.D. Ill. Aug. 26, 2015) (Kennelly, J.) (plaintiff who spent fifteen

months in jail prior to acquittal could bring due process claim against officers who allegedly planted physical evidence and submitted police reports they knew to be false). [17]

In this case, there is a plausible argument that the confessions of Plaintiffs' co-defendants caused Plaintiffs' convictions, even though none of those confessions was introduced at either Plaintiff's trial. The finder of fact in both Plaintiffs' bench trials (that is, Judge Hett) also presided over the trials of at least two of Plaintiffs' co-defendants. Judge Hett was aware that those co-defendants' confessions implicated Plaintiffs in the murders and corroborated Plaintiffs' own confessions to the police.

The court acknowledges some tension between this reasoning and the court's conclusion, earlier in this opinion, that Plaintiffs' right to a fair trial was not compromised by the officers' failure to disclose the coercive techniques they used to obtain confessions from Plaintiffs' co-defendants. But the legal standard for a claim of evidence fabrication does not focus on the comparatively narrow question of whether the withholding of impeachment evidence prejudiced Plaintiffs' right to a fair trial, and may be satisfied where fabricated evidence proximately causes, "in *some* way," the deprivation of a criminal defendant's liberty. *Brueggemann*, 682 F.3d at 580 (emphasis added). Even if evidence of coercion had been disclosed to Plaintiffs, it is difficult to imagine when, or how, they would have had the opportunity to impeach the credibility of their co-defendants' confessions unless those confessions were introduced at Plaintiffs' own criminal trials. But it is less difficult to imagine that Judge Hett's awareness of the incriminating assertions in the co-defendants' confessions influenced his conclusions that Plaintiffs were guilty, even though he knew those confessions were not in evidence in their cases.

---

[17] Defendants suggest that *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017), requires claims alleging a *pre*-trial deprivation of liberty to be brought under the Fourth Amendment, rather than the Fourteenth. This court need not decide the question; as discussed below, there is a genuine dispute about whether evidence that *was* introduced at Plaintiffs' trials (their own confessions) was fabricated, and thus whether Defendants' misconduct caused Plaintiffs' *post*-trial deprivations of liberty.

The court need not decide whether evidence not introduced at Plaintiffs' trials was, in fact, the proximate cause of their convictions, because a reasonable jury could find that Plaintiffs' *own* confessions, which were introduced at their trials (*see* Gardner Trial Record S-38; Phillips Trial Record 86-90), were fabricated. Unlike Plaintiffs' *Brady* claims, Plaintiffs' claims of evidence fabrication are not foreclosed by their knowledge of the alleged misconduct. The Seventh Circuit distinguishes the effect of fabricated testimony on a criminal defendant's right to due process from the effect of withheld evidence of witness coercion, because coerced testimony "may turn out to be true," and thus may still be helpful to the finder of fact—so long as the coercive methods used to obtain the testimony are disclosed, thereby facilitating impeachment. *Id.* Fabricated evidence, on the other hand, "will *never* help a jury perform its essential truth-seeking function." *Avery*, 847 F.3d at 439. As a result, deprivations of liberty that are "premised on deliberately falsified evidence will always violate the defendant's right to due process"—even where, as here, the criminal defendant was aware that the evidence was falsified. *Id.*

To prove that their own confessions were fabricated, rather than merely coerced, Plaintiffs must show that Defendants knew the confessions were false. *See Petty*, 754 F.3d at 422 ("[A] prosecutor fabricating evidence that she knows to be false is different than getting 'a reluctant witness to say what may be true.'") (quoting *Fields*, 740 F.3d at 1112). In *Petty*, the plaintiff alleged that police "coerced [a witness] into giving false evidence by threatening him with jail time if he did not cooperate, holding him against his will in a locked room without food or water for over 13 hours, badgering him, and pressuring him to identify [the plaintiff] as one of the assailants." 754 F.3d at 423. The Seventh Circuit nevertheless affirmed dismissal of the plaintiff's claim of evidence fabrication, noting the absence of any allegation that the defendants "created evidence that they knew to be false, which is the hallmark of a fabrication case." *Id.*

Here, there are genuine disputes as to whether Defendants knowingly manufactured Plaintiffs' false confessions. Plaintiffs have testified that police provided each of them with pre-

written stories, urged them to adopt the stories and promised them leniency if they did, and coached them as they tried to memorize the details of the stories. Gardner has testified, moreover, that Defendants told the court reporter to stop typing when Gardner gave the "wrong answer" to certain questions. This suggests something beyond mere coercion. It suggests a calculated effort to weave a complex narrative out of whole cloth. Plaintiffs' testimony, if believed, could lead a reasonable jury to infer that Defendants *knew* the confessions were false.

Defendants argue that Gardner's decision to testify at his trial was a superseding cause of his conviction. But a reasonable jury could conclude otherwise. At Gardner's trial, Judge Hett explained his decision to find Gardner guilty by stating "I don't believe [Gardner's] testimony here in court . . . . I choose to believe the facts he gave in his statement [to the police]." (Gardner Trial Record S-35.). This evidence is sufficient to create a genuine dispute of material fact as to whether Gardner's allegedly fabricated confession, rather than his trial testimony, caused his conviction and subsequent imprisonment.

A reasonable jury could conclude that Defendants deliberately manufactured both Plaintiffs' false statements, and that these false statements were the proximate causes of Plaintiffs' convictions and subsequent imprisonment. The court therefore denies Defendants' motion for summary judgment with regard to both Plaintiffs' claims of evidence fabrication.

## III.    Malicious Prosecution (Count V)

Plaintiffs' claims of malicious prosecution also survive. To prevail on such a claim under Illinois law, a plaintiff must show (1) that the defendant "commenced or continued an original criminal or civil judicial proceeding"; (2) that this proceeding "terminated in favor of the plaintiff"; (3) that "there was an absence of probable cause for such proceeding"; (4) "the presence of malice"; and (5) that the plaintiff suffered damages as a result of the proceeding. *Hurlburt v. Charles*, 238 Ill. 2d 248, 255, 938 N.E.2d 507, 512 (2010). "The failure to establish any one of these elements precludes recovery for malicious prosecution." *Sang Ken Kim v. City of Chicago*, 368 Ill. App. 3d 648, 654, 858 N.E. 2d 569, 674 (1st Dist. 2006). Defendants challenge only the

third and fifth elements of Plaintiffs' malicious prosecution claim. The court considers those elements in turn.

### a.    Probable cause

"In a malicious prosecution case, probable cause is defined as 'a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged.'" *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013) (quoting *Gauger v. Hendle*, 2011 Ill. App. (2d) 100316, ¶ 112, 954 N.E.2d 307, 329-30 (2d Dist. 2011)). "It is the state of mind of the person commencing the prosecution that is at issue—not the actual facts of the case or the guilt or innocence of the accused." *Williams*, 733 F.3d at 759 (quoting *Sang Ken Kim*, 368 Ill. App. 3d at 654, 858 N.E. 2d at 674).

Defendants argue that the inculpatory statements Plaintiffs and their co-defendants gave to the police between December 3 and December 5, 1992, were sufficient to establish probable cause for Plaintiffs' prosecution. Defendants note that "a single witness is generally sufficient to establish probable cause as a matter of law," even where that witness is a co-offender. (Defs.' Mot. for Summ. J. 23.) Indeed, "a single witness is generally sufficient . . . *unless the officer has a reason to question the witness' account.*" *Reynolds v. Jamison*, 488 F.3d 756, 765 (7th Cir. 2007) (emphasis added). *Cf. Patrick*, 213 F. Supp. 3d at 1056-57 (stating that a grand jury indictment "procured through false or fraudulent testimony" is not "*prima facie* evidence of probable cause"). Plaintiffs here have presented evidence that *all* of the statements implicating them were obtained via coercion and/or fabrication. Each Defendant-officer was undoubtedly aware of the tactics he himself used to obtain one or more of these statements. And there is evidence that the officers were aware of the tactics used by their colleagues to obtain the other statements: All the co-defendants were interrogated at the same building during overlapping time periods. Deon Patrick and Joseph Brown have testified that they could hear Rodney Matthews yelling and crying from another room in the building, and that Detective Abreu warned

Patrick that he would "get the same thing" (that is, the same treatment) if Patrick didn't "start talking." (Brown Aff. ¶¶ 7-8; Patrick Dep. 370.) A reasonable jury could infer from this evidence that the officers were aware of the interrogation tactics to which their colleagues subjected the various co-defendants.

There is also evidence of cooperation and collaboration among all the Defendant-officers. Detectives Villardita, Johnson, Killacky, O'Connor, and Abreu allegedly took turns interrogating some of the co-defendants, and each allegedly fed one or more of the co-defendants with "facts" that were nearly identical to those his colleagues fed to the other co-defendants. Detective Delaney allegedly agreed to fabricate, at Villardita's request, a police report describing what Faye McCoy said when she viewed a lineup, and Detectives Berti and Glinski allegedly agreed to lie, also at Villardita's request, about the time at which they encountered Daniel Taylor outside Paul Phillips' apartment. A reasonable jury could infer from this evidence of collaboration and cooperation that each officer was aware of the tactics his colleagues used to obtain the various confessions. That jury could then conclude that a person of ordinary care and prudence, who was aware of the circumstances in which each statement was made, would not have honestly believed that such evidence reliably indicated that Plaintiffs committed the offense charged. *See Smith v. Burge*, 222 F. Supp. 3d 669, 691 (N.D. Ill. 2016) (St. Eve, J.) (probable cause for prosecution absent where officers were aware that plaintiff's confession was coerced); *Kincaid v. Ames Dep't Stores, Inc.*, 283 Ill. App. 3d 555, 565, 670 N.E. 2d 1103, 1110 (1st Dist. 1996) (reasonable jury could conclude that statements obtained via offers of leniency lacked sufficient "indicia of reliability" to support probable cause to prosecute).

Defendants next argue that Lewis Gardner's trial testimony provided Defendants with probable cause for Gardner's prosecution, if not for Phillips' prosecution as well. (*See* Defs.' Mot. for Summ. J. 22.) This argument misunderstands the probable cause requirement in malicious prosecution claims under Illinois law. The relevant inquiry is "what the defendants knew at the time of subscribing a criminal complaint," rather than what defendants knew at the

time of arrest or at the time of conviction. *Porter v. City of Chicago*, 393 Ill. App. 3d. 855, 868-69, 912 N.E.2d 1262, 1273 (1st Dist. 2009). Gardner's trial testimony occurred nearly two years after he was indicted; it is therefore irrelevant to the question of whether probable cause existed when he and Phillips were indicted on December 29, 1992.

Defendants point to *Bontkowski v. United States*, 28 F.3d 36 (7th Cir. 1994), to support their claim that Gardner's trial testimony somehow provided Defendants with probable cause to initiate Plaintiffs' prosecution nearly two years earlier. *Bontkowski* involved a plaintiff whose prior conviction for bank fraud had been vacated because of an intervening change in the law that applied retroactively. Bontkowski sued the federal government under the Federal Tort Claims Act, 28 U.S.C. § 2671, arguing that the FBI agents and U.S. Attorneys who initiated charges against him had engaged in malicious prosecution. The district court dismissed the suit as time-barred; the Seventh Circuit then affirmed this dismissal on other grounds. "A prosecution ending in a guilty plea does not end 'in a manner indicative of Plaintiff's innocence," the court asserted. *Bontkowski*, 28 F.3d at 37. "[A]s a matter of common sense," moreover, "by pleading guilty Bontkowski forfeited his chance to dispute the existence of probable cause for his prosecution. Bontkowski may not on one day admit that he did the things he is charged with, and then on a later date claim that it was malicious to charge him with doing the things he admitted." *Id.*

Cases more recent than *Bontkowski* appear to adopt a different standard for Illinois malicious prosecution law. *See, e.g.*, *Cairel v. Alderden*, 821 F.3d 823, 834 (7th Cir. 2016) ("For a malicious prosecution claim, probable cause is determined based upon the facts known to the prosecution at the time of filing, 'not the actual facts of the case or the guilt or innocence of the accused.'" (quoting *Sang Ken Kim*, 368 Ill. App. 3d at 654, 858 N.E. 2d at 574)); *Garcia v. Hudak*, 156 F. Supp. 3d 907, 919 (N.D. Ill. 2016) (Norgle, J.).[18] Regardless whether this

---

[18] Bontkowsi's prosecution very well may have been supported by probable cause, but not because of Bontkowski's guilty plea. Rather, a "person of ordinary care and prudence" could have honestly believed that Bontkowski had "committed the offense charged," *Williams*,

53

represents a change in the law, the facts of *Bontkowski* are easily distinguishable from this case. Unlike Bontkowski, Lewis Gardner did not plead guilty. He testified at his trial in an attempt to present a "withdrawal" defense. More importantly, Bontkowski did not allege "any defect in the facts on which his conviction was based." *Bontkowski*, 28 F.3d at 37. In both Gardner's and Phillips' cases, by contrast, the only incriminating evidence against them prior to Gardner's trial testimony were the allegedly coerced and/or fabricated statements that Plaintiffs and their co-defendants made to the police.

As noted above, a reasonable jury could conclude from the evidence in the record that Defendants knew about the circumstances in which these statements were made, and that a reasonable officer in such a position would not have viewed the statements as reliable evidence of Plaintiffs' guilt. The court therefore cannot grant summary judgment for Defendants on the grounds that probable cause existed for Plaintiffs' prosecution.

### b. Causation

Even if Defendants lacked probable cause, they are not liable for malicious prosecution if their conduct was not the legal cause of Plaintiffs' injuries. *See Patterson v. Burge*, 328 F. Supp. 2d 878, 900 (N.D. Ill. 2004) (Gottschall, J.) (citing *Geisberger v. Vella*, 62 Ill. App. 3d 941, 379 N.E. 2d 947 (1978)). "A superseding cause is something culpable that intervenes." *Scottsdale Ins. Co. v. Subscription Plus, Inc.*, 299 F.3d 618, 621 (7th Cir. 2002). It is "some action of a third party that makes the plaintiff's injury an unforeseeable consequence" of the defendant's conduct. *Id.* Defendants argue that Lewis Gardner's trial testimony was the superseding cause of his injuries because that testimony "broke the chain of causation linking the Defendant Officers to [Gardner's] alleged wrongful prosecution." (Defs.' Mot. for Summ. J. 24.)[19]

---

733 F.3d at 759, because the offense as it was defined at that time made such a belief reasonable.

[19] Defendants do not suggest that Gardner's trial testimony was a superseding cause of Phillips' conviction.

According to Defendants, it was "unforeseeable" that Gardner would testify at all, "let alone provide incriminating testimony." *Id.* But it is entirely foreseeable that a criminal defendant will testify at his own trial—indeed, "[a] criminal defendant's right to testify is 'a fundamental constitutional right.'" *Thompson v. Battaglia*, 458 F.3d 614, 619 (7th Cir. 2006) (quoting *Rock v. Arkansas*, 483 U.S. 44, 53 n.10 (1987)). A criminal defendant's testimony should be even more foreseeable where, as a reasonable jury could find in this case, the key evidence against that defendant is his own prior statement that was coerced and/or fabricated by the police. *Cf. Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996) ([T]he chain of causation is broken by an indictment, *absent an allegation of pressure or influence by the police officers*, or knowing misstatements made by the officers to the prosecutor.") (emphasis added).

Defendants assert that Gardner's testimony "was independent of the Defendant Officers' alleged wrongful conduct," because "Gardner was not threatened or offered any inducement by any police officer to testify or in exchange for his testimony." (*Id.* at 25.) This argument is similarly unpersuasive. Gardner's testimony was not the "independent" action of an intervening "third party," *Scottsdale*, 299 F.3d at 621. Rather, it was the action of Gardner himself—the alleged victim of Defendants' coercion and/or fabrication. That alleged misconduct placed Gardner in the difficult position of choosing whether to explain at trial why he previously admitted to something he didn't do, or to stay silent as that confession is introduced into evidence by the prosecutor. Gardner's choice of the former option was not "independent" of Defendants' alleged misconduct, and it did not break the causal chain between that alleged misconduct and Gardner's subsequent conviction and imprisonment.

A reasonable jury could conclude that Gardner's trial testimony was not the superseding cause of his injuries because it was neither unforeseeable to Defendants nor independent of their alleged misconduct. Defendants' motion for summary judgment therefore must be denied with regard to both Plaintiffs' malicious prosecution claims.

## IV. Officer Heyrman's alleged failure to intervene

Defendants next move for summary judgment on all claims against the estate of the now-deceased Officer Robert Heyrman.  Plaintiffs present only one argument for why Heyrman (and his estate) should be held liable: Heyrman, Plaintiffs claim, "was in fact present [when Lewis Gardner gave his statement] and had a duty to intervene to prevent the obviously false fabricated statement."  (Pls.' Resp. Br. 27.)  Defendants argue that this claim "fails because there is no evidence that Heryman [sic] coerced [Plaintiffs], fabricated or withheld any evidence from the Plaintiffs."  (Defs.' Mot. for Summ. J. 27.)

Defendants correctly note that "[a] plaintiff bringing a civil rights action must prove that the defendant personally participated in or caused the unconstitutional actions."  *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008) (citation and quotation marks omitted).  "Section 1983 creates a cause of action based on personal liability and predicated upon fault."  *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996).  Defendants overreach, however, when they suggest that Heyrman himself must have engaged in coercion, fabrication, or withholding of exculpatory evidence in order to be liable. The Seventh Circuit has "long recognized" that police officers can be liable under Section 1983 where they "have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's right . . . but fail to do so."  *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005).  These "failure to intervene" claims necessarily expand the scope of "fault" for a constitutional violation beyond the individual officer(s) whose own actions violate a plaintiff's rights.  An officer's *inaction* can subject him to liability as well—but only where there is a "realistic opportunity" for that officer to prevent the other officer's misconduct. *Id.*

Defendants claim that there is "not a scintilla of evidence . . . of Heryman's [sic] involvement in any of the alleged wrongful acts."  (Defs.' Mot. for Summ. J. 25)  This isn't entirely accurate, but it is not far off.  Plaintiffs have not presented any evidence that Heyrman was present while Officers Villardita and Johnson interrogated Gardner.  Nor does Gardner

recall Officer Heyrman being present when he gave his court-reported statement. (Gardner Dep. 180-81.) It appears that he was in fact at the scene: the transcript of Gardner's statement lists three individuals (besides Gardner and the court reporter) under the heading "PRESENT." (Gardner Statement 1.) One of these three is "Youth Officer Heryman [sic], Star No. 14984, Area 6 Youth Division." (*Id.*) Four signatures appear on the final page of the statement, one of which appears to be Gardner's and one of which appears to be Heyrman's. (*Id.* at 26.) Detective Villardita, meanwhile, has testified that he "contacted" Heyrman at some point after Gardner "implicat[ed] himself," but that he does not recall "if we finished the statement before he arrived or not." (Villardita Dep. 207-08, 210, 213.)

A reasonable jury could conclude from this evidence that Heyrman was present when Gardner gave his court-reported statement, but not that Heyrman had a "reasonable opportunity" to prevent the violation of Gardner's rights. *Harper*, 400 F.3d at 1064. At the very least, such a "reasonable opportunity" would include knowledge of, or reason to know of, the alleged misconduct. Plaintiffs have not presented any evidence suggesting that Heyrman was aware of the alleged fabrication of Gardner's statement. Nor is there any evidence that Heyrman was aware of the tactics Villardita and Johnson allegedly used at earlier points in Gardner's interrogation to coerce him into giving that statement. There is no evidence in the record that Heyrman was even in the same building as Gardner at any point prior to 3:20 a.m. on December 3, when Gardner gave his statement. It would be pure speculation to infer from this evidence that Heyrman had the requisite opportunity to prevent the violation of Gardner's rights. Such "speculation," the Court of Appeals has warned, "is insufficient to withstand summary judgment." *Morfin v. City of East Chicago*, 349 F.3d 989, 1002 (7th Cir. 2003) (citation omitted). Defendants' motion for summary judgment, therefore, is granted with regard to Plaintiffs' claims against the estate of Robert Heyrman.

## V.      Municipal liability

Defendant City of Chicago has moved for partial summary judgment on any claims for which the court finds in the individual Defendants' favor, insofar as all three of Plaintiffs' theories of municipal liability—that is, 42 U.S.C. § 1983, *respondeat superior*, and indemnification—require the existence of a viable claim against the officers.  (*See* City of Chicago's Reply [136], at 2-3; City of Chicago's Mot. for Summ. J. [108], at 4-5.)  The City also asks the court to dismiss any remaining claims against unidentified parties.  (City of Chicago's Mot. for Summ. J. 4-5.)  Plaintiffs do not respond to either of these arguments in their opposition brief.  (*See* Pls.' Resp. to Def. City's Mot. for Summ. J. [123].)  Rather, they argue that the City maintains a practice or custom of coercing, fabricating, and suppressing evidence, and is therefore liable pursuant to *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 659 (1978).

Some language in the City's briefs suggests that a municipality can *never* be held liable under *Monell* where an individual defendant is not also held liable, but that's not quite true.  "The actual rule," the Seventh Circuit has explained, "is much narrower: a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict."  *Thomas v. Cook Cty. Sheriff's Dept.*, 604 F.3d 293, 305 (7th Cir. 2010).  The City cannot be liable under *Monell* if its officers did not, in fact, violate Plaintiffs' constitutional rights.  But the City could still be liable if, for example, Plaintiffs had simply failed to name as defendants the individual officers who violated Plaintiffs' constitutional rights.  *Id.* Similarly, although Illinois law states that "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable," 745 ILCS 10/2-109, a plaintiff who settles his or her tort claims against a city employee does not automatically foreclose municipal liability if the city would otherwise be liable for the employee's conduct.  *See LaPorta v. City of Chicago*, 102 F. Supp. 3d 1014, 1020 (N.D. Ill. 2015) (Leinenweber, J.) (citing *Whitney v. City of Chicago*, 155 Ill. App. 3d 714, 508 N.E.2d 293, 297 (1st Dist. 1987).

That said, the City is correct that it cannot be held liable for conduct that did not actually violate Plaintiffs' rights. The existence of the practice or custom that Plaintiffs allege would not allow Plaintiffs to hold the City liable for Defendant-officers' alleged *Brady* violations, because the court has concluded that Plaintiffs have not presented evidence that such violations occurred in the first place. Nor would the existence of the alleged municipal practice or custom allow Plaintiffs to recover for Officer Heyrman's non-existent breach of his duty to intervene. As these are the only claims on which the City seeks summary judgment, the court need not decide at this time whether Plaintiffs have presented sufficient evidence of the alleged municipal custom or practice.

The City's motion is granted with regard to Plaintiffs' *Brady* claim, as well as their claim that Robert Heyrman failed to intervene. The court also dismisses Plaintiffs' claims against any remaining unidentified parties. *See Williams v. Rodriguez*, 509 F.3d 392, 402 (7th Cir. 2007). The City's motion is denied with regard to Plaintiffs' claims of evidence fabrication and malicious prosecution, and on any other remaining claims on which the court has not granted summary judgment for the Defendant-officers.

## CONCLUSION

The court grants in part and denies in part Defendants' partial motions for summary judgment [108, 110]. Defendants are entitled to summary judgment with regard to Plaintiffs' claim that they suppressed exculpatory evidence, as well as their claim that the now-deceased Robert Heyrman failed to intervene. The motions are otherwise denied.

ENTER:

_Rebecca R. Pallmeyer_

Dated: March 13, 2018

_____
REBECCA R. PALLMEYER
United States District Judge